**Supreme Court**

No. 2014-261-Appeal.
(KD 13-1085)

Tracy Gregoire et al.                          :

              v.                               :

Baird Properties, LLC et al.                   :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Tracy Gregoire et al.               :

v.                                  :

Baird Properties, LLC et al.        :

Present: Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**   The defendants, Baird Properties, LLC (Baird Properties) and Michael Baird (Baird), appeal from a Superior Court judgment in favor of Tracy Gregoire and Mark Traynor (collectively, plaintiffs) in an action brought under the Residential Landlord and Tenant Act, G.L. 1956 chapter 18 of title 34.[1]  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1] The complaint included a third plaintiff, Carl Truax. The trial justice entered judgment against Truax from which he has not appealed.  Consequently, his claims are not before this Court for review.

# I

## Facts and Procedural History

On November 4, 2011, plaintiffs entered into a residential lease with Due North Investments, LLC (Due North) to reside in the second-floor unit of 29 Spring Street, West Warwick (the property), commencing on November 15, 2011. The plaintiffs resided on the property with Gregoire's two minor children and Carl Truax, who was a father-figure to Traynor. Robert and Linda Carey (the Careys) were the principals of Due North and resided on the first floor of the property. Due North had purchased the property from Baird Properties in 2011; however, Baird Properties reacquired title in 2012 when it foreclosed upon a mortgage it held on the property. A foreclosure deed was recorded on December 5, 2012. Shortly thereafter, on December 10, 2012, the property was condemned by the Town of West Warwick due to a lack of electricity, heating, and water, and plaintiffs were required to vacate the premises and remove their belongings.

On December 27, 2012, plaintiffs filed a complaint in Kent County District Court alleging that defendants purposely sabotaged utility services to the property in order to deliberately set events in motion that would force plaintiffs to vacate the premises. Specifically, the complaint alleged that Baird Properties violated § 34-18-44[2] (count 1), that Baird individually violated § 34-18-44 (count 2), malicious destruction of property by both defendants (count 3), and negligence by both defendants (count 4). The plaintiffs removed the matter to the Superior Court on October 8, 2013, by appealing from a judgment by stipulation in the District

---

[2] General Laws 1956 § 34-18-44 provides, in relevant part, that "[a] landlord may not * * * take possession of [a] dwelling unit by * * * willful diminution of services to the tenant by interrupting or causing the interruption of heat, running water, hot water, electric, gas, or other essential service to the tenant * * *."

Court.[3]  On January 15, 2014, the case proceeded to trial de novo in the Kent County Superior Court.

## A

### Trial Testimony

The evidence adduced at trial may be summarized as follows.  Traynor testified that he and Gregoire entered into a lease agreement with Due North to reside in the second-floor unit of the property.[4]  He testified that, in a September 7, 2012 letter, Baird Properties informed plaintiffs that it had been appointed to act on behalf of Southbridge Savings Bank (Southbridge) to collect rental payments to the property and that as of that date all payments should be made payable to Southbridge and delivered to Baird Properties.  The letter informed plaintiffs that rental payments should no longer be paid to Due North.  Traynor testified that plaintiffs also received a letter from Due North, dated September 8, 2012, claiming that Baird was forbidden to enter properties owned by Due North and that all rents owed should be paid to Due North. Traynor testified that he had continued to make rent payments to Due North for the months of September and October; however, after obtaining legal advice, he had not paid the November rent to either Due North or Baird Properties.

Traynor further testified that, on December 9, 2012, as plaintiffs were leaving their apartment with their children, they ran into Baird on the sidewalk near Traynor's vehicle.

---

[3] Appeals from actions brought pursuant to the Residential Landlord and Tenant Act, chapter 18 of title 34 (RLTA) shall follow G.L. 1956 § 9-12-10.1. Section 34-18-47.  Section 9-12-10.1 provides that any party to a civil action brought pursuant to the RLTA "may cause the case to be removed for trial on all questions of law and fact to the [S]uperior [C]ourt * * *."

[4] Although the lease was executed on November 4, 2011, by both Traynor and Gregoire, the transcript indicates that Traynor testified that he moved into the unit "around November of 2012."  This appears to be a mix-up with dates or a typographical error because Traynor's testimony throughout the trial and filings before this Court are consistent with his having moved into the second-floor unit in November 2011, not 2012.

According to Traynor, Baird communicated to them that he had "gained control of six properties" and that plaintiffs "needed to be at his office the next day to pay a security deposit and any back rent and to sign a new lease * * * [o]r he [would] hav[e] the water and electrical turned off." Traynor further stated that despite not wanting to leave the property or intending to abandon it, he was required to leave because the property had been condemned. He also explained that he entered the basement on the property on a weekly basis, including a last visit on December 8, and that he had never observed any problems with the boiler while he was there. He testified that while he resided at the property he never had any problems with the electrical panel.

Gregoire also testified that on December 9, 2012, plaintiffs were approached by Baird as they were getting into their vehicle. She testified that Baird "told [plaintiffs] [they] had to be at his office on Monday morning * * * [t]o sign a new lease, pay any back rent and a new security deposit * * * before noontime or he was coming back to shut the electric and water off." She recalled that on the next day, December 10, 2012, Baird came to the property in the early morning and she notified Truax that he was there. She testified that she heard banging downstairs and yelling directed at the first-floor tenants. She explained that she was not sure what the banging noise was but that she heard Baird say "that the first[-]floor tenants were 'F-ing squatters'" and "needed to get the hell out of the apartment." She also testified that later that day the building inspector and the fire department came to the property and she was informed by the building official that she would not be allowed to remain on the property as it was "unlivable." She testified that she did not want or intend to leave the property, but did so "[b]ecause the building was deemed unsafe and [she] ha[d] two children." Gregoire testified that she was in the property's basement "[w]eekly, if not a couple of times a week," and had never observed any

- 4 -

problems with the boiler or electrical panel. During cross-examination, Gregoire acknowledged that, although she testified to having no electrical issues on the property prior to December 10, she would "pop a breaker if the washing machine and microwave went off at the same time * * *."

Truax, who also resided in the second-floor unit, testified that on December 10 Gregoire informed him that Baird was on the property but that he did not think much of it because Baird was always there. Truax testified that, when he went to make coffee, there was no running water. He testified that he proceeded to call Baird and inquire about the water and Baird informed him that he would return to the property in fifteen minutes to turn the water on. Truax explained that when Baird arrived at the property he turned the water back on, but then it went off again. Truax testified that "[o]nce the water went off [he] heard a lot of banging downstairs." He also testified that he heard a lot of yelling and profanity from Baird, including Baird calling out to the first-floor tenants: "f-ing squatters. Get off my property. You're scum." Truax testified that, when he went downstairs to the basement, he observed Baird "taking the heater unit off of the first[-]floor boiler." He also testified to observing that the covers had been taken off of the electrical panels, and that the first-floor panel was smashed and the wires were pulled out of the second-floor panel. Truax testified that at that moment Baird told him "that he turned the water and electric off," that the "[s]cumbags on the first floor need[ed] to get the 'F' off [his] property[,]" and that Truax needed to get to Baird's office and sign his lease. Truax testified that he became angry and told Baird that Baird needed to get a copy of the lease to his lawyers. At that moment, Truax testified, Baird grabbed his phone and dialed what he assumed to be 911 because within minutes the fire department arrived, as well as the building official and building inspector.

Truax further testified that, prior to December 10, he had last been in the basement on December 6. At that time, he observed that the electrical panel was intact, that the cover was on, and that the boiler had no problems. He stated that the building inspector communicated that, although the tenants did not have to move, they could not sleep on the property. He explained that, after everyone left, Baird told him that if Truax "got down there and signed the lease and gave money, [Baird] could sign the lease and fix things tomorrow." Truax testified that he was forced to find somewhere else to stay until the electrical panel was fixed for their unit, but he posted a sign on the exterior door to the unit before leaving that read: "This property is not abandoned. To gain access, to call Carl Truax."[5]

Next, Joseph Argenti, the chief electrical inspector for the Town of West Warwick, testified regarding the field inspection notice that he prepared on December 10, 2012. Argenti testified that Baird asked him and the building official to go out that morning to take a look at the property. He testified that he did not recall smelling any smoke but did observe several building code violations, including that the electrical panels were compromised and all the wiring was pulled out of both electrical panels. He also testified that he observed that the junction boxes, which usually are a termination point for wiring, had no covers on them and the wiring was ripped out. He further observed that there was open wiring in overhead fixtures in both the first- and second-floor units. Argenti also testified regarding other deficiencies found in the apartments, including the lack of any smoke detectors. Due to all the violations he observed, Argenti called National Grid to shut the power off. He testified that "within a day or so [he was] sure any contractor could have corrected the deficiencies." He testified that a permit was issued

---

[5] Truax also testified regarding the occurrences of December 21, 2012, when he found out that his personal belongings had been placed in a dumpster by Baird. However, because Truax and his claims relating to the destruction of personal property are not before this Court, we shall abstain from summarizing that portion of his testimony.

on December 27, 2012, for the repairs and that when he re-inspected the property on December 31, "[t]he electrical in both units passed." As such, he called National Grid and the electricity was restored.

Kerry Anderson, the building official for the Town of West Warwick, testified that on December 10, 2012, he received a call from Baird asking that he inspect the property. He testified that he noted many deficiencies on the property upon his inspection, including that the burner had been removed and placed on the floor, which rendered it useless, and that the electrical panel covers were off, exposing all the connections to the circuit breakers and wires. He testified that the wires "were all pulled forward from the panels themselves like somebody reached in and did this." Additionally, Anderson testified that it appeared that the boiler was also serving as a water heater and that the safety shutoff button was removed from the second safety device above the boiler.[6] He testified that he did not smell smoke or observe signs of a fire. He also noted that the smoke detectors were removed from the second and third floors of the property.

Anderson testified that, after his inspection, he spoke to the tenants, including plaintiffs, and "told them that without heat or water, that the building would be determined to be unsafe and uninhabitable and they would have to leave" effective on December 10. He also estimated that the repairs that needed to be made to the property could have been made within a day. He testified that he sent a notice to Baird Properties on December 11, informing it that the violations found on the property needed to be repaired. He also sent a fax to the Kent County Water Authority requesting that the water to the property be "shut off at the street due to house being unsafe due to no heat or electric." Lastly, he testified regarding a notice sent from him to all

---

[6] The safety device turns off the boiler in the event that the boiler overheats or catches fire.

tenants reminding them that the property was posted as unsafe and that the property needed to be "fully vacated" by four o'clock on December 17—meaning that all the tenants' personal belongings had to be completely removed.

Gerald Barlow, the owner of Barlow Heating, LLC, testified on behalf of defendants. He testified that on December 10, in response to a call from Baird's property manager, he met Baird at the property to "check some issues with the boiler." He recalled that the basement on the property had "an odor of fumes or something coming from the boiler." He noted that "[t]here was only one boiler in operation" and that the boiler was the source of the odor. He testified that the "fuses weren't plugged, [and that] the boiler needed to be cleaned." Barlow testified that the boiler's poor condition was due to the boiler not having been serviced properly and having been neglected over a period of time. Barlow also testified that, for the boiler that was operational, he removed the oil burner and took it back to his shop to clean it. He also disconnected the fire switch so that the burner could not run. He testified that he ultimately repaired the boilers in January, after the electricity was back on at the property.

Baird was the final witness to testify. He testified that he was the sole member of Baird Properties, and that on December 5, 2012, Baird Properties obtained a foreclosure deed for the property, which had been previously owned by Due North. He testified that during the foreclosure process he had not had a good relationship with the Careys, who resided in the first-floor unit of the property during that time. He testified that, in addition to the property at issue, Baird Properties had also foreclosed on four other properties that Due North owned. Baird testified that on December 9, 2012, he approached plaintiffs informing them that "if they wanted to stay in the apartment * * * they [had] to re[-]sign a lease with [him] and that there was a threat from the [Kent County] Water Authority indicating that they were going to shut the water off for

- 8 -

nonpayment and [that] now [he] owned the property." Baird testified that he learned through a conversation that he had with the Water Authority that Due North had not paid the water bills since it purchased the property from him, but that in fact, the Water Authority had never threatened to shut off the water.

Baird testified that on December 10, he went to the West Warwick Police Department with a copy of the foreclosure deed and visited Anderson, who informed Baird that he would be inspecting the property that day. He testified that he next went to the property, where he observed that the latch to the basement door was broken and upon entering the basement he "immediately smelled fumes." He testified that with the help of a flashlight he observed that "[t]he first[-]floor furnace was puffing back." He further testified that he instantly "shut the switch off to it and went and shut the breaker off," then "went to [his] truck and contacted the West Warwick building official," and then had his office contact Barlow. He testified that he saw Truax outside at that time, and told Truax that the furnace in the first floor was off, that the water was shut off, and that Barlow was on his way. He testified that Truax shrugged his shoulders and told him to do whatever he had to do. Baird testified that he asked Truax to notify him when the building inspector arrived, "in the event that he show[ed] up before [Baird] g[o]t back" to the property. He testified that Truax called him and he returned to the property shortly after the building official arrived. At trial, Baird insisted that there was "no reason" to threaten Truax that he would turn off the water if he did not sign the lease—as Truax had testified— "because [] Truax was not on the lease that the Careys had turned over" to him.

Moreover, Baird testified that Barlow also arrived to inspect the boiler and informed Baird that, if he wanted him to fix the boiler, he could not do it right there "because he needed some parts" and "had to take it, fix it and bring it back." Baird also testified that Barlow "told

[him] that he was taking the [fire switch] off of the boilers * * * until he returned to fix them." He further testified that he spoke to the electrical inspector, Argenti, and the building official, Anderson, regarding the situation as it existed in the basement. He testified that he explained to both that Barlow was in the basement and he had shut the breaker off on the switch to the first floor, but that the second floor was still on. At this point, Baird testified that Argenti inquired regarding the whereabouts of the panel covers and observed that the wires in the house were hanging in disarray. He testified that the two inspected the basement in his presence, but that he was not present when they inspected the two units. He testified that "[p]rior to that morning[,] he had been to the basement "[a] year and a half ago"—at a time when he held title to the property. When asked who made the decision to turn off the electricity to the property, he attested that "[w]hen [the building official] went upstairs and found no smoke detectors and bare open wires on two or three electrical boxes on the first floor * * * [he] indicat[ed] that there was no way he was going to leave power in this house until this stuff was fixed." Baird testified that, because the power was being shut off and it was quite cold outside, he suggested that they call the Kent County Water Authority to have the water shut off as well. He also testified that plaintiffs had contacted his office "a couple of days later" and indicated that they would not sign a lease or stay at the second-floor unit and would be out by the time noted on the building official's notice.

Baird testified that, on December 11, he went to the property to protect it because the property was not insured and the first-floor tenant, Robert Carey, had "indicated to [him] in a prior conversation * * * that he would lighter fluid the floor [sic] and burn the house to the ground." He testified that he knocked on the first-floor door that was "open and the latch was all busted and smashed" but that this did not "alarm" him "because it happen[ed] all the time." He

claimed that he noticed that the tenants' cars parked on the street near the property had "windows [that] were completely frozen over," indicating that the tenants had stayed overnight, and he contacted the police to remove them from the property. He testified that the police told him "it was not their problem," but they arrived later that morning at the request of the Careys, who reported that Baird had kicked in their door. The police interviewed the Careys, Truax, and a neighbor, and then arrested Baird for disorderly conduct. Baird testified that he was later found not guilty of this charge.

## B

## Superior Court Decision

Following the close of evidence, the trial justice issued a written decision rendering judgment in favor of plaintiffs Gregoire and Traynor, and against plaintiff Truax. The trial justice—in finding that Baird was at all times acting as an agent of Baird Properties—rendered judgment exclusively against Baird Properties and not against Baird in his individual capacity. Importantly to this appeal, the trial justice found that Gregoire and Traynor testified more credibly regarding their interaction with Baird on December 9, 2012, which was characterized by Gregoire as a threat. He found that the "only reason" plaintiffs left on December 10 was that "they were forced to do so by the notice from the building inspector posted at the [p]roperty" and that plaintiffs had not abandoned the property. The trial justice further found that Baird went to the property on December 10, 2012, "with the intent of tampering with the electrical system" and that "his calls to the building officials that morning were for the purpose of alerting them to conditions he knew would result in an order" from the town to vacate the property.

Moreover, the trial justice found that Gregoire and Traynor were tenants on the property owned by Baird Properties and that Baird Properties was the landlord as a result of the Due

North foreclosure. Additionally, the trial justice found that Baird Properties was bound by the terms of the written lease executed by Due North, that it was not legally necessary for plaintiffs to sign a new lease or pay an additional security deposit, and that Baird Properties was deemed to be holding all rent that plaintiffs had paid to Due North in 2012. The trial justice also ruled that Baird Properties could not exercise a self-help remedy as a result of plaintiffs owing back rent. Next, he determined that Baird acted in violation of § 34-18-44 when he threatened loss of heat and electricity on December 9, 2012, unless plaintiffs signed a new lease, paid back rent, and paid a new security deposit. Finally, he found that Baird "acted in accordance with his threat by intentionally creating an uninhabitable condition on December 10, 2012." Ultimately, the trial justice held that plaintiffs Gregoire and Traynor were entitled to the statutory remedy provided by § 34-18-34. As damages, he awarded three months' rent ($2,955), reasonable attorney's fees (amount to be determined), and the return of plaintiffs' security deposit ($985).

The plaintiffs filed a petition for attorney's fees in the amount of $22,750 with a supporting affidavit by trial counsel, including a detailed four-page statement of services rendered compiled from the billing records maintained by trial counsel's firm, and an affidavit from an attorney with twenty-nine years' experience practicing law attesting to the reasonableness of the fee. The defendants filed an objection without any supporting documents. A hearing was held on May 16, 2014, to determine the amount of attorney's fees to be awarded. During the hearing, defendants' objection to the sum requested by plaintiffs was two-fold. First, defendants claimed that, because plaintiffs' counsel knew "going into this case" that the maximum recovery value was $3,940—three months' rent and a return of the security deposit— the $22,750 requested could not be reconciled with the recovery amount. Second, defendants argued that when looking at the affidavit and timesheets provided by plaintiffs, it became

impossible to break out the time spent pursuing Truax's claims—claims that were ultimately unsuccessful and therefore should not be the basis for any of the attorney's fees awarded.

The plaintiffs argued, and the trial justice agreed, that this case was not a simple landlord-tenant proceeding, but was "extremely fact-intensive." Additionally, the trial justice found that requiring trial counsel to seek "separate legal fees for each plaintiff that he represented * * * would be an unreasonable burden to place on counsel." The trial justice noted that there was no evidence before the court to rebut the affidavits submitted by plaintiffs. The trial justice held that the attorney's fees requested were "fair and reasonable" and ordered Baird Properties to pay $22,750. Final judgment entered on June 13, 2014. The defendants filed a notice of appeal. This Court remanded the case to the Superior Court for entry of a corrected judgment providing that judgment entered in favor of Baird on all claims against him individually. The corrected judgment entered on May 27, 2015.

## II

### Standard of Review

"When a trial justice presides over a nonjury trial, Rule 52(a) of the Superior Court Rules of Civil Procedure requires that he or she 'find the facts specially and state separately [his or her] conclusions of law thereon.'" South County Post & Beam, Inc. v. McMahon, 116 A.3d 204, 210 (R.I. 2015) (quoting Rule 52(a)). "The trial justice, however, 'need not engage in extensive analysis to comply with this requirement.'" Id. (quoting JPL Livery Services, Inc. v. Rhode Island Department of Administration, 88 A.3d 1134, 1141 (R.I. 2014)). "This Court has recognized that [a] trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive * * *." Id. (quoting JPL Livery Services, Inc., 88 A.3d at 1141). "[I]f the decision reasonably indicates that [the trial justice] exercised [his or her] independent judgment

in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." Id. (quoting JPL Livery Services, Inc., 88 A.3d at 1141).

Moreover, "[i]t is well settled that [t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence * * *." South County Post & Beam, Inc., 116 A.3d at 210 (quoting JPL Livery Services, Inc., 88 A.3d at 1141). "On review, [w]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." Id. (quoting JPL Livery Services, Inc., 88 A.3d at 1142). "When 'the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached.'" Id. (quoting JPL Livery Services, Inc., 88 A.3d at 1142). "We will, however, review questions of law de novo." Id. (quoting JPL Livery Services, Inc., 88 A.3d at 1142).

### III

### Discussion

On appeal, defendants challenge several findings of fact made by the trial justice, including: that plaintiffs had not intended to vacate the property when they left on December 10, 2012, that a landlord-tenant relationship existed between plaintiffs and Baird Properties, that Baird caused the deficient conditions, that Baird threatened to shut off the electricity and water, that Baird was on the property on December 10, 2012 to tamper with the electrical system, and that the amount of attorney's fees requested was reasonable. The defendants claim that plaintiffs' intent to vacate the property in December was supported by Traynor's testimony that

they received a minimum delivery of oil in the month of November. Additionally, defendants argue that because the rent checks and money orders were to be made payable to Southbridge, "this clearly shows that Baird Properties * * * was acting as an agent for Southbridge * * * at the bank's request pursuant to the bank's assignment of rents. As such[,] this does not create a landlord[-]tenant relationship between * * * [p]laintiffs and Baird Properties * * *." The defendants also argue that, although the trial testimony indicated that plaintiffs executed a lease with prior owners, "there was no testimony establishing that the lease was recorded and that there was any landlord[-]tenant relationship with * * * Baird for the [property]." The defendants insist that plaintiffs failed to meet their burden of proof in part because "[t]here is not a scintilla of evidence that * * * Baird caused any of th[e] damage * * *." The defendants suggest that the apartment units' deficiencies and the malfunctioning furnaces were a result of neglect by the former owners and that Baird was on the property to safeguard it against threats made by the Careys. Finally, defendants argue that "the award for attorney's fees in the sum of $22,750 is not reasonable in light of the amount of recovery and lack of complexity of litigation."

After reviewing the material submitted and arguments made by the parties, it is our opinion that this case hinges on the following three issues: (1) whether the trial justice correctly determined that a landlord-tenant relationship existed; (2) whether the trial justice correctly determined that Baird tampered with essential services to the property; and (3) whether the award of attorney's fees was reasonable.

## A

### Landlord-Tenant

The Residential Landlord and Tenant Act (the act) defines "[l]andlord" as "the owner * * * of * * * the building." Section 34-18-11(7). An "[o]wner" is defined as "any person who,

- 15 -

\* \* \* [h]as legal title \* \* \* to any dwelling \* \* \* or [h]as charge, care, or control of any dwelling \* \* \* as owner or agent of the owner \* \* \*." Section 34-18-11(10)(i),(ii). The act defines "[t]enant" to mean "a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others." Section 34-18-11(17).

Here, it is undisputed that Baird Properties obtained title to the property at a foreclosure auction and recorded the deed on December 5, 2012, and that Baird was the sole member of Baird Properties. It is also undisputed that plaintiffs entered into a residential lease with Due North to reside on the property as tenants commencing in November of 2011. Section 34-18-23(c) provides, in pertinent part, that a "purchaser of property \* \* \* takes title subject to the same rights and responsibilities toward the tenant that the seller or mortgagor had."[7] Therefore, according to the act, there was a landlord-tenant relationship between plaintiffs and Baird Properties on December 9, 2012. Thus, the trial justice correctly found that plaintiffs were lawfully on the property on December 9 and 10, as tenants under an existing lease and that a landlord-tenant relationship with Baird Properties existed at that time.

**B**

**Tampering**

Section 34-18-44 of the act provides that:

> "A landlord may not recover or take possession of the dwelling
> unit by action or otherwise, including willful diminution of
> services to the tenant by interrupting or causing the interruption of

---

[7] The trial justice's decision in this case issued on February 20, 2014; subsequently, § 34-18-23(c) was amended, effective July 8, 2014. Because "this Court has traditionally applied the law in effect at the time we consider an appeal," Solas v. Emergency Hiring Council of Rhode Island, 774 A.2d 820, 826 (R.I. 2001), we apply § 34-18-23(c) as amended by P.L. 2014, ch. 486, § 1. In our opinion, the additional language included in the amended statute has no bearing in the analysis or outcome of this appeal.

- 16 -

> heat, running water, hot water, electric, gas, or other essential service to the tenant, except in case of abandonment, surrender, or as permitted in this chapter."

It is well established that "a trial justice sitting without a jury must often make credibility determinations in order to arrive at the necessary findings of fact." D'Ellena v. Town of East Greenwich, 21 A.3d 389, 391-92 (R.I. 2011) (quoting B.S. International Limited v. JMAM, LLC, 13 A.3d 1057, 1062 (R.I. 2011)). This Court accords a substantial amount of deference to such credibility determinations given that the trial justice "had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." Id. at 392 (quoting B.S. International Limited, 13 A.3d at 1062).

After a careful review of the trial transcript and exhibits, it is our opinion that the trial justice did not overlook or misconceive material evidence. The defendants' contentions with respect to the trial justice's decision are mainly centered on issues of credibility—that the trial justice chose to believe plaintiffs' versions of events over defendants'. It is precisely these types of credibility findings with which this Court is loathe to interfere. See D'Ellena, 21 A.3d at 392. The trial justice's findings that Baird threatened plaintiffs on December 9 with shutting off the water and electricity if they did not sign a new lease, pay rents due, and make another security deposit were supported by the trial testimony of both plaintiffs. Gregoire testified that Baird "told [them] that [they] had to be at his office on Monday morning before noontime or he was coming back to shut the electric and water off." Similarly, Traynor testified that Baird told them that they "needed to be at his office the next day to pay a security deposit and any back rent and to sign a new lease * * * [o]r he was having the water and electrical turned off." The trial justice's finding in this regard was clearly supported by trial testimony.

Furthermore, we are satisfied that the trial justice's finding that it was in fact Baird who caused the damage to the property on December 10 was a permissible inference given the evidence. Testimony was presented by Gregoire, Traynor, and Truax that, prior to December 10, no deficiencies were observed with the boiler or electrical panel, despite plaintiffs having routinely visited the basement. Additionally, there was testimony from plaintiffs, and from Baird himself, that he had not had a good relationship with the first-floor tenants. Both Truax and Gregoire testified to hearing Baird yell at the Careys on December 10 that they needed to leave his property. Furthermore, several witnesses placed Baird in the basement early that morning. Therefore, the trial justice did not abuse his discretion in finding that Baird acted with the intent of making the property uninhabitable and the tenants being ordered to vacate. We perceive no cause, therefore, to disturb the factual findings of the trial justice.

## C

### Attorney's Fees

Section 34-18-34 of the act provides, in relevant part, that "[i]f a landlord * * * willfully diminishes services to the tenant by interrupting or causing the interruption of heat, running water, hot water, electric, gas, or other essential service, the tenant may recover * * * reasonable attorney's fees." This Court affords deference to the trial justice's determination of what constitutes reasonable fees. See, e.g., Karousos v. Pardee, 992 A.2d 263, 264, 272, 273 (R.I. 2010) (reviewing amount of attorney's fees awarded as reasonable in defending against an abuse-of-process action under the anti-SLAPP statute and upholding decision to exclude fees incurred in pursuing an ultimately unsuccessful motion).

Based on the clear language of § 34-18-34, plaintiffs were entitled to request reasonable attorney's fees. On appeal, however, defendants have failed to properly present an argument to

this Court to support their assertion that the trial justice's award of attorney's fees was unreasonable. In their prebriefing statement, defendants' argument in its entirety consists of one sentence claiming that "the award for attorney's fees in the sum of $22,750 is not reasonable in light of the amount of recovery and lack of complexity of litigation." Moreover, defendants chose not to file a supplemental statement explicating the basis of their reasoning. It is well established that this Court generally "consider[s] an issue to be waived when a party '[s]imply stat[es] an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues * * *.'" Bucci v. Hurd Buick Pontiac GMC Truck, LLC, 85 A.3d 1160, 1170 (R.I. 2014) (quoting State v. Chase, 9 A.3d 1248, 1256 (R.I. 2010)). Consequently, the issue is not properly before us.

At oral argument, the defendants made a valiant attempt to resurrect the issue of attorney's fees. A thorough review of the record, however, reveals the futility of such efforts.[8] The plaintiffs' counsel filed an affidavit itemizing the work he performed on the case, which totaled 113.75 hours, and averring that his billing rate was $200 per hour. The plaintiffs also submitted an affidavit from a veteran litigator who opined that the billing rate and hours expended were fair and reasonable and necessary for the plaintiffs to pursue their claims. The defendants, on the other hand, neither presented a counteraffidavit nor did they accept the trial justice's invitation for an evidentiary hearing. Based upon the record, there are simply no grounds for us to disturb the trial justice's ruling that an award of attorney's fees as set forth in counsel's affidavit was fair and reasonable.

---

[8] At the time of the show-cause hearing, a transcript of the May 16, 2014, hearing on plaintiffs' petition for attorney's fees was not available to this Court, notwithstanding a docket entry that the transcript had been transmitted to us. Since the show-cause hearing, however, this transcript has been located.

**IV**

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

Justice Flaherty did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        Tracy Gregoire et al. v. Baird Properties, LLC et al.

**CASE NO:**        No. 2014-261-Appeal.
(KD 13-1085)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    April 26, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Allen P. Rubine

**ATTORNEYS ON APPEAL:**

For Plaintiffs:   James Moretti, Esq.

For Defendants:  Thomas M. Dickinson, Esq.