March 19, 2021

**Supreme Court**

No. 2018-339-Appeal.
(WC 16-27)

Charles Martin et al.            :

v.            :

Glen Wilson et al.            :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Charles Martin et al.          :

v.          :

Glen Wilson et al.          :

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** An unneighborly dispute between owners of adjacent parcels of land over the use of a "right of way easement" in a subdivision in Richmond is the genesis of this appeal. More specifically, this Court is asked to address whether an implied easement exists over a portion of a common driveway system.

The defendants, Glenn Wilson and Valerie Wilson (collectively defendants or the Wilsons), appeal from a Superior Court judgment entered in favor of the plaintiffs, Charles Martin and Nicole Martin (collectively plaintiffs or the Martins).[1] The Martins succeeded on their claim for injunctive relief in Superior Court, allowing them access to a common driveway for the purpose of entering and exiting their property and enjoining the Wilsons from interfering with such use. Conversely,

---

[1] We note that there are inconsistencies in the record regarding the spelling of Mr. Wilson's first name. We utilize the proper spelling, "Glenn."

the Wilsons' counterclaims for trespass and injunctive relief were dismissed by the trial justice. On appeal, the Wilsons contend that the trial justice erred by (1) allowing parol evidence to be admitted; (2) finding an implied easement over the common driveway; and (3) finding that the Wilsons' counterclaims were moot. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On February 13, 1995, William and Anna Rzepecki conveyed a large tract of land on Kingston Road (Route 138) in Richmond, Rhode Island, to Midwestern Homes, Inc. (Midwestern Homes). Previously, on January 24, 1995, a plan had been recorded in the land evidence records establishing an eight-lot subdivision, North County Estates (the subdivision). A private right-of-way, or common driveway system, was created on the subdivision for purposes of constructing homes, installing septic systems, and providing access to the lots without impacting existing wetlands. The plan for the subdivision was approved by the Rhode Island Department of Environmental Management (DEM), the Rhode Island Department of Transportation (DOT), and other agencies as required.

On October 29, 1996, the Wilsons purchased Lot 4 of the subdivision from Midwestern Homes. The warranty deed included a reference to map 168, slide 118B

in the land evidence records.[2]  This map did not include any depiction or reference to the common driveway system.  The Wilsons have owned this property from the time of purchase to the present and lived there continuously until approximately mid-2016.  At the time of trial, their property was occupied by tenants.

On May 31, 2013, the Martins took title to Lot 3 of the subdivision.  This lot had three prior owners, only one of whom had a deed that included any reference to the common driveway system.  The Martins' deed included a reference to map 168, slide 118B.  The Martins reside on this property with their son, who has severe disabilities.

Both the Martins and the Wilsons access their homes through the common driveway system that runs south off Route 138.  The common driveway climbs a steep hill atop of which are situated their respective homes.  The common driveway forks to the Martins' private driveway on the right (the first entrance); it then continues a short distance to the Wilsons' house on the left.  At trial, Mrs. Martin testified that, at the time they purchased their property, there was a second means of

---

[2] We note that the "Recorded Plan for North County Estates" was recorded in the Richmond Land Evidence Records on January 24, 1995, at 3 p.m. and is referenced as map 168, slide 118B.  That document depicts the eight-lot subdivision without any easement, right-of-way, or common driveway system.  Simultaneously, however, a "Right of Way Easement Plan for North County Estates" was recorded as map 168, slide 119A, showing the easement to which we refer as the common driveway system.  Significantly, the original deeds conveyed by Midwestern Homes to both Lots 3 and 4 contain a reference only to map 168, slide 118B.

- 3 -

egress to the common driveway system. One could enter their private driveway at the first entrance, continue in a southerly direction past their house, then curve to the east to connect back to the common driveway system (the southerly exit). The common driveway system itself continues in a southerly direction, straddling the properties of both parties, past the Wilsons' house on the east to the northerly boundary of Lot 7 of North County Estates.[3] It is the portion of the common driveway system that lies south of the first entrance to the Martins' driveway that is the subject of the parties' dispute.

According to Mrs. Martin, large vehicles—such as the school buses that dropped off or picked up their son, oil trucks, and trash trucks—would typically either back into their driveway and leave nose-first down the hill or pull into their driveway nose-first, then back out into the common driveway system so that they could descend the hill in a forward direction.

On May 25, 2015, the Wilsons had a survey completed for their property by Clift Land Surveying, LLC. On June 24, 2015, the Wilsons' attorney sent the Martins a letter stating that the Martins were trespassing on the Wilsons' property and demanding that they cease and desist, including for purposes of turning vehicles around. The Wilsons explained later that they took particular issue with the activities

---

[3] As Lot 7 is owned by The Nature Conservancy and has been dedicated for conservation purposes, the common driveway system has been developed for vehicular access only as far as the Wilsons' house.

of the school buses because the headlights would shine into the Wilsons' front bedroom—where Mr. Wilson slept for a short period of time—when the school buses were departing in the morning. In 2015, the Wilsons began parking their cars in such a manner that the school buses could not maneuver using any portion of the common driveway south of the Martins' first driveway entrance. Later, the Wilsons erected a stockade fence—blocking the Martins from using the southerly exit—and put up a chain across the common driveway system, south of the first entrance. Larger vehicles—primarily school buses—then had to back down the steep hill into another branch of the common driveway or directly onto Route 138.

On January 19, 2016, the Martins filed the current action against the Wilsons. The plaintiffs sought a permanent injunction ordering defendants to remove the chain across the common driveway and to cease any actions that would hinder plaintiffs' use of the common driveway and a permanent mandatory injunction requiring defendants to remove the stockade fence placed along the boundary line. The defendants answered and filed a counterclaim, requesting that they be awarded damages for plaintiffs' trespass onto their property and that the Superior Court enjoin plaintiffs from traveling past the first entrance on the common driveway.

On February 4, 2016, the Superior Court entered a temporary restraining order requiring defendants to remove the chain from the common driveway and to refrain from parking their vehicles within forty feet of the entrance to plaintiffs' property.

On March 10, 2016, the temporary restraining order was modified to allow defendants to place the chain across the common driveway. A two-day bench trial was held, commencing on January 9, 2018.

**A**

**The Trial**

At trial, plaintiffs called Christopher Duhamel, Mrs. Martin, and Jennifer McHugh to testify. Mr. Duhamel was a principal at DiPrete Engineering Associates, a civil engineering and land surveying firm; and, at the time of trial, he had been a professional engineer and professional land surveyor for over twenty-five years. Mr. Duhamel was the engineer who oversaw the permitting for the subdivision. He was responsible for acquiring zoning permitting, planning board permitting, and environmental permitting.

In regard to environmental permitting, Mr. Duhamel testified that he had to gain approval from the DEM Division of Freshwater Wetlands, because there were "freshwater wetlands that are regulated on the property that are required to be protected." As a result of the zoning and environmental restrictions, the engineering firm, as a means of providing ingress and egress to each of the lots from the public road, "created a private right-of-way to access the lots. The private right-of-way would be to avoid any wetlands or impact to any wetlands." Mr. Duhamel testified that the location of the houses in the subdivision was determined "from the testing

- 6 -

that's done onsite, the approved soil areas, approved by RIDEM, ISDS [individual sewage disposal system] Division, and then designing a septic system within that area and then designing a house in that proximity."[4]  The common driveway also had to be "located outside of protected wetlands and protected buffers."[5]

Mr. Duhamel further discussed the septic tank installation, explaining that the septic system was determined to conform with the appropriate plan on July 10, 1996. Mr. Duhamel testified that this indicates that the driveway had to be in existence at the time because, otherwise, "none of this construction could have occurred[.]"  He also testified that "[his] office inspected all these stages of the site construction, and [they] utilized that access to get to the lots."

Mrs. Martin testified regarding not only her experience with defendants and the property at issue but also about her experience as the Manager of the Statewide Transportation Program for the Rhode Island Department of Education, through her employer TransPar.  Mrs. Martin described her property as "at the top of a very steep hill."  She stated that

> "[w]hen you come off of [Route] 138, you have to go up
> an easement that's very, very steep.  At the top of the hill
> my house is situated on a property, the front yard slopes

---

[4] The DEM ISDS Division is now known by the acronym OWTS (onsite water treatment system).

[5] According to Mr. Duhamel, buffers are "defined by DEM as within 50 feet of a wooded wetland.  A wetland that's less than three acres in size would not have a * * * buffer.  A stream that's less than 10-feet wide would have a 100-foot riverbank wetland, a 100-foot buffer."

down. There's another easement leading to another neighbor on the other side of [my] home, and then there's woodlands that are wetlands that abut Route 138, and then I have property at the rear of our house that is fairly flat at that point and more woodlands in the back."

Mrs. Martin also described parts of her property as having "rocks, trees, and * * * very large boulders." She further stated that, at the time she purchased the property, the Martins had two entrances to their property from the common driveway. The first entrance is paved and branches from the common driveway at a point slightly north of their house. The second entrance, the southerly entrance, was a dirt area that was past the Martins' home and connected the Martins' driveway back to the common driveway at a further southerly point.

Mrs. Martin testified that her son was picked up and dropped off by his school buses in the morning and afternoon five days a week throughout the entire year, other than the month of August. Mrs. Martin's son "received door-to-door bus service per the [Americans with Disabilities Act] for special needs individuals since he started school at age three." The morning bus typically would pick up the Martins' son between 6:30 a.m. and 7 a.m.[6] Mrs. Martin observed the school buses using their headlights and flashing their yellow and red lights when picking up her son. She also testified that, due to her profession, she knew that federal and state

---

[6] Mrs. Wilson, in her testimony, pegged the time as "between 6:05 [a.m.] and 6:15 [a.m.]."

guidelines regulate the use of the lights during pickup and drop-off of students. The bus would also make several noises; "[t]he first would be the driver announcing his arrival over the PA system, and the second would be the backup alarm that turns on the second the bus is put in reverse." Mrs. Martin testified that, during their first few years living in their home,

> "the bus would typically come up and either back into [plaintiffs'] driveway, load [their] child, and then leave driving nose-first down the hill * * * [or] would pull into [their] driveway nose-first and then back out onto the common driveway * * * it backs up and then would go down nose-first."

Mrs. Martin testified that defendants began impeding plaintiffs' use of the common driveway by

> "parking cars in the common driveway right after the entrance to [the Martins'] driveway so that a school bus that would pull into [their] driveway nose-first could not back up * * * or if they wanted to pull forward and then back into [the] common driveway, they also could not do that because the cars were there."

Mrs. Martin then stated that defendants placed a chain across the common driveway "right after the entrance" to plaintiffs' driveway. Mrs. Martin also stated that the southerly entrance remained the same until 2015, when the Wilsons erected the fence blocking the southerly entrance from access to the common driveway. Mrs. Martin also testified that, after the fence was erected, stones were placed along the common driveway directly across from the entrance to plaintiffs' driveway.

Mrs. Martin observed that, once the Wilsons started parking cars and placed a chain across the common driveway, the school buses had to change the way they picked up and dropped off her son. She stated that the bus "at times would have to stay out on the common driveway itself because it could not back up anywhere to turn around, and then it would have to back all the way back down the common drive to 138 or one of those other branches of the easement." Mrs. Martin testified that this was particularly concerning because

> "there's no lighting, so they only have their reverse lights when they're backing down the hill. It's a very steep grade, and you cannot see where you're going because you're pointed down. * * * [T]he drivers usually use their aide as a second set of eyes, and even with the aide looking out the rear of the bus, they would have a hard time knowing when they needed to start turning onto the branch of the easement that leads to Lot 2. And a lot of times they would have to come back up and take multiple shots at it because they could not see. Those taillights were not enough light. Snow and ice, sliding, slipping. They on one day actually slid to the side of the road, and where the snow is banked because of the plow, they got stuck there for a little while before they could get themselves out."

Mrs. Martin further testified that the oil and trash trucks had operated similarly to the bus and also had to change their operation once the fence and chain were erected.

Jennifer McHugh, a bus attendant for school bus company First Student, testified that she was a bus monitor for about two years while the Martins' son rode the bus. She also testified that, when she was first on the bus picking up the Martins' son, the bus "would go up the driveway, up to [his] driveway entrance. [It] would

- 10 -

have to pull forward and back into his driveway to safely load him." Ms. McHugh also stated that the Martins' driveway presents a challenge in the morning when it is dark, particularly in bad weather and when trying to back up.

The defendants then called Mrs. Wilson, Mr. Wilson, Attorney Justin Shay, and Mrs. Martin to testify. Mrs. Wilson testified that she and her husband lived continuously in their home in the subdivision from October 1996—when they purchased the property from Midwestern Homes—until approximately a year and a half before trial. Mrs. Wilson also testified that, when they moved into their home, all of the homes in the subdivision were built and some were already occupied. She further stated that none of the prior owners of Lot 3 ever used the portion of the common driveway south of the first entrance.

Mrs. Wilson testified that at some point she and her husband erected the stockade fence. She also testified that they put up a small stone wall across from plaintiffs' driveway because Mr. Martin was backing his truck onto their property and digging up the dirt. Further, she stated that none of her prior neighbors had attempted to use the southerly entrance as a second driveway. Mrs. Wilson also testified that she and her husband placed a chain across the driveway to prevent the school buses from accessing the common driveway south of the Martins' first entrance. However, prior to plaintiffs moving into their property, defendants never

had occasion to prevent anyone from accessing this disputed part of the common driveway.

Mr. Wilson testified that he is a retired truck driver and purchased his home with his wife in 1996. He also testified that, between 1996 and 2013, he had observed oil trucks, UPS trucks, and garbage trucks enter the property now owned by plaintiffs. Mr. Wilson stated that on those occasions the trucks would "turn around then back up the hill." However, he also agreed that a school bus would have difficulty backing down the long driveway unless it had the proper lights.

Mr. Wilson reiterated that he and his wife had placed the rocks across from the Martins' driveway entrance. They also put the chain up across the common driveway around the same time. He stated that they placed the rocks there because "the Martins were backing out of their driveway, lipping over [the Wilsons'] tar and tearing it up, along with the school buses, which has dislodged the rocks, hitting it with their bumpers."

Attorney Justin Shay testified as an expert title attorney with thirty-five years of experience. He stated that the legal description in defendants' deed did not refer to any easements, rights-of-way, or common driveways. Attorney Shay also noted that the deed referred to plat map 168, slide 118B. He testified that the referenced map does not depict any rights-of-way or easements. Attorney Shay further stated that the same map is referenced in the deed for Lot 3 granted by Midwestern Homes.

## B

## The Trial Justice's Decision

On October 3, 2018, the trial justice issued her written decision. As a threshold issue, the trial justice determined that Mr. Duhamel's testimony was admissible because "it is unclear and ambiguous as to whether Midwestern Homes intended to convey the easements and Rights-of-Way—depicted in [s]lide 119A[.]"

Although the trial justice rejected plaintiffs' argument that they had an easement by incipient dedication, she found that an implied easement existed over the common driveway. The trial justice found that Mr. Duhamel's testimony evidenced that an easement was required for the property's use and enjoyment, noting that the "construction and development of the Subdivision could not have occurred without the Right-of-Way driveway system in place allowing access to each Subdivision Lot."

The trial justice then concluded that the Martins should prevail on their claim for injunctive relief. The trial justice also rejected defendants' counterclaims, determining that many of those claims were moot once an implied easement was found. Accordingly, the trial justice allowed plaintiffs access to the disputed area of the common driveway and permanently prohibited defendants from obstructing such use.

Final judgment entered on October 24, 2018. The defendants filed a timely notice of appeal on November 8, 2018.

## II

## Standard of Review

It is well established that "this Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Quillen v. Macera*, 160 A.3d 1006, 1010 (R.I. 2017) (brackets and deletion omitted) (quoting *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016)). This Court will "accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *Id.* (quoting *Gregoire*, 138 A.3d at 191). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *Gregoire*, 138 A.3d at 191). However, we "review questions of law *de novo*." *Id.* (quoting *Gregoire*, 138 A.3d at 192).

"[W]hen reviewing the grant or denial of a permanent injunction, we will reverse the lower court on appeal only when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *JHRW, LLC v. Seaport Studios, Inc.*, 212 A.3d

168, 175 (R.I. 2019) (quoting *Nye v. Brousseau*, 992 A.2d 1002, 1010 (R.I. 2010)).

"The issuance and measure of injunctive relief rest in the sound discretion of the trial justice." *Cullen v. Tarini*, 15 A.3d 968, 981 (R.I. 2011). "On review, the decision of the trial court made in the exercise of a discretionary power should not be disturbed unless it clearly appears that such discretion has been improperly exercised or that there has been an abuse thereof." *Id.* (brackets omitted) (quoting *Keystone Elevator Co. v. Johnson & Wales University*, 850 A.2d 912, 921 (R.I. 2004)).

## III

### Discussion

Before this Court, defendants claim that the trial justice made several errors in issuing her decision. First, defendants claim that the trial justice erred in allowing parol evidence to be admitted as it pertains to the warranty deeds. Second, defendants argue that the trial justice committed an error in finding that an implied easement existed in this case. Finally, defendants contend that, because the implied easement did not exist here, their counterclaims were not moot.

The plaintiffs reply that courts routinely consider other kinds of extrinsic evidence to determine whether an implied easement exists. Further, they assert that this evidence does not affect the terms of the deed but rather explains the surrounding circumstances; thus, by its nature, the evidence cannot be parol evidence. The plaintiffs also argue that the initial owner of this property, Midwestern Homes, used

this easement before severance and that the use of the easement is reasonably necessary for plaintiffs' enjoyment of their property. Accordingly, they argue that the trial justice properly determined that an implied easement exists. Finally, plaintiffs contend that, because the trial justice properly found in their favor and granted an injunction, the trial justice also properly found that defendants' claims were moot.

## A

### Parol Evidence

The defendants first argue that the trial justice committed an error by considering Mr. Duhamel's testimony in the course of determining Midwestern Homes's intent regarding the existence of easements in the subdivision. The defendants contend that this testimony was parol evidence that alters the terms of the relevant deeds, which do not reference either the easements or a map depicting the easements. The defendants argue that any maps not referenced in the deed also should be considered to be parol evidence and should not have been considered by the trial justice to determine whether an easement exists. The defendants further contend that the interpretation of the language in the Wilsons' deed and the Martins' deed is central to the determination of whether plaintiffs had an easement over the common driveway.

"[T]he parol evidence rule bars the admission of any previous or contemporaneous oral [or written] statements that attempt to modify an integrated written agreement." *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 276 (R.I. 2004). That rule is grounded in the notion "that a complete written agreement merges and integrates all the pertinent negotiations made prior to or at the time of execution of the contract." *Management Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1174 (R.I. 2019) (quoting *Carlsten v. Oscar Gruss & Son, Inc.*, 853 A.2d 1191, 1195 (R.I. 2004)). "Once integrated, other expressions, oral or written, that occurred prior to or concurrent with the integrated agreement are not viable terms of the agreement." *Id.* (quoting *Carlsten*, 853 A.2d at 1195).

We agree with defendants that the language in all the relevant deeds is clear and unambiguous. By referencing only map 168, slide 118B, those deeds did not create an express easement to utilize the common driveway system. The fact that slide 119A, depicting that right-of-way, was recorded in the land evidence records at the same time as slide 118B is of no significance. The question before us, however, is whether an implied easement was created. "The proper inquiry for the existence of an easement by implication * * * focuses on the facts and circumstances at the time of severance." *Vaillancourt v. Motta*, 986 A.2d 985, 988 (R.I. 2009). Such an inquiry requires the consideration of extrinsic evidence. Thus, we are of the opinion that the trial justice appropriately considered Mr. Duhamel's testimony and

- 17 -

trial exhibits not referenced in the deeds to determine whether or not an implied easement existed.

**B**

**Easement by Implication**

The defendants next argue that a permanent injunction should not have been granted because the trial justice erred in finding that plaintiffs had an implied easement over the disputed portion of the common driveway. The defendants assert that the evidence before the trial justice did not establish that use of this area was necessary for any owner of the property—past or present—now owned by plaintiffs. The defendants further contend that the Martins' desire to have a school bus pick up their son in a certain manner does not outweigh defendants' property rights.

When the severance of land occurs, "a grant will be implied of all those continuous and apparent easements which have in fact been used by the owner during the unity, though they have no legal existence as easements." *Caluori v. Dexter Credit Union*, 79 A.3d 823, 830 (R.I. 2013) (quoting *Wellington Condominium Association v. Wellington Cove Condominium Association*, 68 A.3d 594, 603 (R.I. 2013)). "It is well established that 'an implied easement is predicated upon the theory that when a person conveys property, he or she includes or intends to include in the conveyance whatever is necessary for the use and the enjoyment of the land retained.'" *Vaillancourt*, 986 A.2d at 987 (brackets omitted) (quoting *Hilley*

- 18 -

*v. Lawrence*, 972 A.2d 643, 650 (R.I. 2009)). "The test of necessity is whether the easement is reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made." *Id.* at 987-88 (brackets omitted) (quoting *Wiesel v. Smira*, 49 R.I. 246, 250, 142 A. 148, 150 (1928)). The existence of an implied easement must be established by clear and convincing evidence. *Wellington Condominium Association*, 68 A.3d at 603.

We first turn to the continuous and apparent use of the disputed section of the common driveway by Midwestern Homes before severance of the property. The trial justice relied heavily on Mr. Duhamel's testimony that the common driveway system was necessary for the construction and development of the subdivision. Mr. Duhamel testified that "none of this construction could have occurred[,]" as to the septic systems, foundation of houses, and other construction, if the easement was not being utilized. He also testified that "[his] office inspected all these stages of the site construction, and [they] utilized that access to get to the lots." The trial justice found this testimony to be "highly credible and most insightful." The trial justice also considered plat map 168, slides 118B and 119A, to ascertain Midwestern Homes's intent upon divesting the lots in the subdivision. She noted that both DEM and DOT approved plans that depicted the common driveway system right-of-way, further indicative of Midwestern Homes's intent.

- 19 -

We defer to the trial justice's factual findings and determinations regarding witness credibility. *See Quillen*, 160 A.3d at 1010. Here, the trial justice considered the significant amount of evidence—including testimony, aerial photographs of the land, and various land maps—and did not overlook or misconceive such evidence. *See id.* The only material evidence regarding Midwestern Homes's use of the common driveway systems was that to which Mr. Duhamel testified. Based on the trial justice's careful consideration of Mr. Duhamel's testimony and the maps recorded by Midwestern Homes, we find no error in the trial justice's determination that Midwestern Homes exercised continuous and apparent use of the common driveway system at the time of severance.

Finally, we must consider whether the easement was "reasonably necessary" for the enjoyment of plaintiffs' property at the time the severance was made. *See Vaillancourt*, 986 A.2d at 987-88. The trial justice again considered Mr. Duhamel's "informative" testimony, noting that he testified that the "protected wetlands and buffer zones" created a need to establish the common driveway system as a way of ingress and egress to the various lots in the subdivision. Significantly, Mr. Duhamel testified that at the time of severance the only access to Lot 3 (the Martins' Lot) was from the common driveway. Thus, he stated, "none of [the] construction could have occurred without that access being in existence." We think it no less reasonable that large commercial vehicles, such as school buses and delivery trucks, be able to use

- 20 -

the disputed area for turning around in order to descend the hill safely today than it was for construction vehicles to use the same area before the lots were severed in 1996.

After carefully reviewing the record, we are well satisfied that the trial justice appropriately considered and weighed the evidence before her in finding that plaintiffs established an implied easement over the disputed section of the common driveway. We discern no error in this finding and conclude that the trial justice neither overlooked nor misconceived material evidence in making that determination.

The defendants have not raised any other arguments as to the trial justice's granting of a permanent injunction, and therefore we deem it unnecessary to discuss the trial justice's determination that the other elements of a permanent injunction were established at trial. In holding that the trial justice appropriately found that an implied easement existed, we defer to her sound discretion in the issuance and measure of injunctive relief.[7] *Cullen*, 15 A.3d at 981.

---

[7] Because we uphold the trial justice's determination that an implied easement existed, we need not, and do not, address plaintiffs' alternative argument concerning incipient dedication.

## C

## The Wilsons' Claims

Finally, the defendants argue that the trial justice erred in finding that their claims for declaratory judgment, trespass, and equitable relief were moot, because, according to the defendants, an implied easement did not exist. "This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Hallsmith-Sysco Food Services, LLC v. Marques*, 970 A.2d 1211, 1213 (R.I. 2009) (quoting *State v. Medical Malpractice Joint Underwriting Association*, 941 A.2d 219, 220 (R.I. 2008)). Because we uphold the trial justice's determination that an implied easement exists, these claims are moot.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

Justice Flaherty participated in the decision but retired prior to its publication.

Justice Lynch Prata and Justice Long did not participate.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Charles Martin et al. v. Glen Wilson et al. |
| **Case Number** | SU-2018-339-Appeal.<br>(WC 16-27) |
| **Date Opinion Filed** | March 19, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Kelly M. Fracassa, Esq.<br>For Defendants:<br><br>Timothy J. Robenhymer, Esq. |

SU-CMS-02A (revised June 2020)