**SEA FARE'S AMERICAN CAFÉ, INC., et al.**

v.

**BRICK MARKET PLACE ASSOCIATES, et al.**

**No. 2000–324–Appeal.**

Supreme Court of Rhode Island.

Dec. 18, 2001.

Joseph R. Palumbo, Jr., Middletown, for plaintiff.

Gerald John Petros, Providence, Brian C. Newberry, James Marcellino, for defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

The allocation of costs and the contractual rights of the parties under both a lease agreement and an addendum for the purchase and sale of a restaurant business are at the heart of this declaratory judgment action. The defendants, Brick Market Place Associates and Federal Management Co., Inc. (collectively, BMPA), appeal from an order granting partial summary judgment to the plaintiffs, Sea Fare's American Café, George Karousos and Anna Karousos (collectively, Sea Fare), as well as from a final judgment ordering it to pay Sea Fare $114,951.06, including interest, after a nonjury trial on the issue of damages. On appeal, BMPA asserts that the trial justice misconstrued the terms of an unambiguous written lease between the parties, granted summary judgment based upon erroneous factual findings, and made unsupported, speculative factual findings at trial.

### Facts/Procedural History

On February 15, 1992, Sea Fare negotiated and entered into a lease agreement with BMPA to rent a portion of a building in Brick Market Place, Newport. The parties agreed upon a regular monthly rent, as well as additional payments based upon Sea Fare's revenues, its share of the building's water usage, and its "percentage share" of expenses.

The leased premises consisted of a 6,600–square–foot portion of a 19,611–square–foot building. It had been occupied previously by a failed restaurant called "Dave and Eddie's." BMPA held a valid security interest in Dave and Eddie's business assets, and offered to sell them to Sea Fare for $100,000. After conducting a walk-through inventory of the assets, Sea Fare was satisfied that it would be purchasing what it viewed as a "turn-key" operation and executed an agreement for the purchase and sale of the business assets. Before the closing, Sea Fare was informed that some assets were being removed from the premises. It reported the problem to BMPA; however, BMPA assured Sea Fare that there was $50,000 in escrow to cover the replacement of improperly removed assets. Satisfied with this assurance, and despite the fact that it was not scheduled to take possession of the premises for several days afterwards, Sea Fare consummated the purchase and sale agreement.

Like opening the oven door too soon on a soufflé, as soon as Sea Fare actually took possession of, and opened the front door of the leased premises, the relationship between the parties began to sink. Sea Fare alleged that most of the glassware, silver-

ware and dishes that it had agreed to purchase from BMPA were missing. Sea Fare contended that although BMPA had promised to refund the replacement value of the missing items from the money in escrow, BMPA refused to honor that promise when Sea Fare presented it with the actual bill.

Meanwhile, a storm was brewing over the allocation of the "additional rent" portion of the lease. The lease provides that "[i]n the event the rentable space within the Property increases or decreases, Lessee's Percentage Share [of the additional rent] shall be adjusted accordingly." Sea Fare contended that by leasing out the parking lot and by increasing the number of parking spaces in that lot, BMPA increased the property's rentable space. Consequently, Sea Fare maintained that its percentage share of additional rent payments should have been decreased.

Another bone of contention arose concerning the issuance of parking spaces. Sea Fare asserted that in doing so, BMPA had breached the lease. In addition, Sea Fare averred that it had been overcharged for its proportionate share of the building's water and sewer bill, a fact it did not discover until it installed its own separate water meter.

Before trial, the parties filed cross-motions for partial summary judgment. After hearing and reviewing all the evidence, the trial justice granted Sea Fare's motion and denied the motion of BMPA. She found that: (1) by leasing the parking lot year-round and increasing the size of the lot, the rentable space had increased; accordingly, Sea Fare's percentage share of the additional rent should be decreased; and, (2) the missing inventory was removed the day before the closing; consequently, in accordance with the purchase and sale contract, BMPA was responsible to reimburse Sea Fare for the expense of its replacement.

After summary judgment was entered, a nonjury trial was conducted to determine the reasonable replacement cost of the missing inventory; the adjusted percentage share of additional rent; and the extent, if any, that Sea Fare was overcharged for water. After the trial concluded, the trial justice ordered BMPA to: pay Sea Fare $9,511.33 in compensation for the missing inventory; reduce Sea Fare's percentage share of the additional rent from 33.96 percent to 16.5 percent and refund overpayments; and, reimburse Sea Fare the difference between the amount it charged for water in 1998 and the amounts it charged in both 1993 and 1994. BMPA now appeals.

## Analysis

BMPA raises several issues on appeal. First, it contends that the trial justice erred by including the parking lot in her computation of the total rentable space because the lease specifically provides that Sea Fare's "percentage share" is based upon its 33.96 percent occupancy within the building. It maintains that only ·an increase or decrease in the amount of rentable space within the actual building could cause the percentage share to be adjusted. BMPA then asserts that the trial justice erred in finding that the missing assets were removed before the closing and, given the fact that there was no specific inventory made of those assets, that she erred in relying upon Sea Fare's bill in determining the amount of damages. Finally, BMPA maintains that Sea Fare did not present any evidence demonstrating that it had been overcharged for water, and asserts that the trial justice arbitrarily and capriciously estimated a figure that was based upon pure speculation.

### (i) The Additional Rent

Although both parties insisted below that the lease agreement is unambiguous, both parties strongly advocated different interpretations of the provisions concerning the calculation of additional rent.

"We have emphasized before that '[t]he purpose of summary judgment procedure is issue finding and not issue determination.'" *D.T.P., Inc. v. Red Bridge Properties, Inc.*, 576 A.2d 1377, 1381 (R.I.1990) (quoting *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 582, 410 A.2d 986, 992 (1980)). It is well established that, on a motion for summary judgment, if the moving party carries its initial burden of establishing that no genuine issue of material fact exists for a finder of fact to resolve, "the nonmoving party then must identify any evidentiary materials already before the court and/or present its own competent evidence demonstrating that material facts remain in genuine dispute." *Heflin v. Koszela*, 774 A.2d 25, 29 (R.I.2001) (quoting *Doe v. Gelineau*, 732 A.2d 43, 48 (R.I. 1999)). "[T]he nonmoving party 'cannot rely solely on mere allegations or on the denials contained in the pleadings to defeat the motion.'" *Id.* Notwithstanding, "[a]n ambiguity in a contract cannot be resolved on summary judgment." *Rotelli v. Catanzaro*, 686 A.2d 91, 95 (R.I.1996). That is because "the construction of ambiguous contract terms is a question of fact." *Id.* "A contract is ambiguous if, in light of our rules of contract interpretation, it is reasonably susceptible of different constructions." *D.T.P., Inc.*, 576 A.2d at 1381 (quoting *Westinghouse Broadcasting Co.*, 122 R.I. at 579, 410 A.2d at 991).

In this case, the disputed lease provides that the "demised premises" leased by Sea Fare consists of "approximately 6,660 square feet of floor space within the building located at 151 Swinburn Row, in Newport[.]" The lease then provides that "[s]aid land and building is hereinafter called the Property[.]" The lease later provides that for purposes of calculating Sea Fare's amount of additional rent, "Lessee's Percentage Share shall be * * * 33.96 [percent] based upon a total rentable space *within the building* of Nineteen Thousand Six Hundred Eleven (19,611) square feet." The lease then states that "[i]n the event that the rentable space *within the Property* increases or decreases, Lessee's Percentage Share shall be adjusted accordingly." (Emphasis added.)

Sea Fare contends that the term "property" refers to all the land at 151 Swinburn Row, including the parking lot, and that the trial justice correctly determined that the rentable space within the property had increased when BMPA leased out the parking lot on an annual basis. BMPA takes the opposite position. It maintains that the percentage share can be based only upon the actual square footage leased within the building and that the additional rent can be adjusted only if the building is expanded or contracted.

The lease clearly states that calculation of Sea Fare's percentage share of the additional rent is based upon its proportionate share of occupancy within the building.[1] The lease provides that such percentage share would be adjusted if the rentable space within the property were to change. However, it makes no provision for calculating Sea Fare's percentage share of the additional rent if the increase in "rentable space" is not contained within "the build-

---

1. According to the lease, part of the additional rent would be used to maintain the parking lot.

ing." Conceivably, that is because the term "property" refers only to the building and the land it occupies and not to all the land located on the lot.

The record reveals that at the time the lease was signed, Sea Fare was aware that all users of the parking lot were being charged a fee to park during each summer tourist season.[2] Since Sea Fare took possession of the premises, however, those parking their cars in the lot are charged a fee regardless of the time of year. However, the fact that the calculation of additional rent is based only upon proportional occupancy of the building rather than of the property as a whole suggests that the parties may not have intended the parking lot to be included within the definition of property for the calculation of rentable space.

Because the provisions concerning the calculation of Sea Fare's percentage share of additional rent are ambiguous and, thus, raises a question of fact about the intent of the parties to the contract, the trial justice erred in granting Sea Fare's partial motion for summary judgment on this issue.

### (ii) The Missing Inventory

■ It is undisputed that items of inventory were improperly removed from the premises. However, BMPA asserts that the trial justice improperly granted partial summary judgment in favor of Sea Fare on this issue because, it contends, there are genuine issues of material fact about exactly when that improper removal occurred. BMPA observes that the business purchase and sale agreement provides that: "Seller assumes all risk of destruction, loss, or damage * * * up to the date of closing[,]" and notes that Sea Fare did not report the loss until two days after the closing. Consequently, it contends

that there should have been a trial to determine when the removal took place and whether the risk of loss had shifted to Sea Fare. The trial justice unequivocally rejected this contention below and, based upon the evidence before her at the time, we cannot say that she erred.

Although BMPA maintained that there was a genuine issue of material fact concerning the timing of the inventory's disappearance, it did not offer any competent evidence to show that the missing items were removed from the premises after the closing, thereby refuting the evidence presented by Sea Fare. Consequently, it did not carry its burden of proving that genuine issues of material facts remained in dispute.

The undisputed evidentiary materials submitted by Sea Fare reveal that, before signing the business purchase and sale agreement, Sea Fare conducted a walk-through inventory of the premises. At that time, Dave and Eddie's was open for business and was very busy. Consequently, a detailed, particularized inventory of the smaller items was not feasible, and only the larger, more expensive items specifically were listed on the agreement. However, after observing that everything appeared to be running smoothly, and satisfied that the former business had the necessary and appropriate amount of inventory required for a turn-key restaurant operation, Sea Fare agreed to purchase the assets.

Subsequently, a day or two before the closing, Sea Fare received an anonymous tip that items were being improperly removed from the premises. Not having access to the building, Sea Fare immediately contacted BMPA to report its concerns. BMPA assured Sea Fare that it

---

**2.** Indeed, in the lease, BMPA reserved the right to charge a fee to all users of the lot and to charge those of Sea Fare's customers who use the lot for more than one hour.

would refund from the escrow account the cost of improperly removed inventory. At the closing, BMPA again assured Sea Fare that it would accept full responsibility for the replacement cost of any items that might be missing. Although Sea Fare was not scheduled to take possession of the premises and its inventory until two days after the closing, based upon BMPA's assurances, it participated in the closing of the purchase and sale agreement.

When Sea Fare actually took possession of the premises, it discovered that many items were missing, including almost all the dishes, silverware and glassware. Sea Fare promptly informed BMPA about the loss and was advised to replace the missing items and that the purchase price would be refunded from the escrow account.

From this evidence, we conclude that the trial justice did not err when she found in favor of Sea Fare on the issue of the missing inventory. *See Heflin,* 774 A.2d at 29.

■ BMPA next contends that even if the items had been removed before the closing, it was impossible to determine exactly what was missing because Sea Fare did not itemize the assets on its inventory list. As a result, it maintains that because the quantity and quality of the missing inventory was unknowable, that the trial justice's calculation of damages was based upon pure speculation and was legally improper.

■ "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures and cannot rely upon speculation." *National Chain Co. v. Campbell,* 487 A.2d 132, 134–35 (R.I.1985). "However, '[p]laintiffs will not be denied recovery merely because the damages

* * * are difficult to ascertain, as long as they prove damages with reasonable certainty.'" *Id.* at 135.

At trial Karousos presented an invoice for the items he had purchased. The record reveals that he is alleged to be an experienced restaurateur who owns a dining establishment in Portsmouth and is said to enjoy a worldwide reputation as a gourmet chef and food writer. He testified that purchasing restaurant supplies is an integral part of running a restaurant, and that he has had ten years of such purchasing experience. He stated that the standard procedure for calculating the amount of inventory needed to make a restaurant operational is based upon that restaurant's seating capacity. Applying that formula to the leased premises, he calculated what inventory was missing and then purchased its replacement. He then presented the bill as evidence of that purchase.

The trial justice specifically found Karousos's undisputed testimony to be credible and, based upon that testimony, she found that the fair and reasonable cost of replacing the missing inventory was $9,511.33, plus interest. Recognizing that the precise number of missing inventory items was difficult to ascertain, we cannot say that she erred in making that determination.

### (iii) Charges for Water Usage

■ BMPA contends that the trial justice's decision ordering it to refund charges for water usage was arbitrary, capricious and not supported by the evidence.

The record reveals that in 1992 and 1993, the first two years of the lease, the entire building possessed just one water meter. BMPA asserts that during that period, it made water usage assessments based upon its good-faith estimates of Sea

Fare's proportionate share of the water usage. In February 1994, as permitted by the lease, Sea Fare installed its own separate water meter.[3] Subsequently, Sea Fare's water usage assessments dramatically declined. Sea Fare contested the previous assessments as being too high. At trial, Karousos testified that, based upon his experience, start-up restaurants use substantially less water than do those that are established. He further testified that as a restaurant becomes established, he would expect its water usage charges to increase with the additional business rather than decrease as it did in this case.

Based upon the competent evidence before her, the trial justice found that Sea Fare had been overcharged for water usage during the first two years of its operation and that, pursuant to the lease, it was entitled to contest these charges. Recognizing that such damages were hard to calculate, she observed that since the separate meter had been installed, the highest water usage charge had occurred in 1998 and that it was far less than the assessments of 1992 and 1993. Using the 1998 charge as a baseline, she ordered BMPA to refund the difference between what Sea Fare paid in that year and what it overpaid in both 1992 and 1993.

 Acknowledging that "the findings by a trial justice sitting without a jury in a civil case are accorded great weight and will not be disturbed on review 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties[,]'" *Kingstown Mobile Home Park v. Strashnick,* 774 A.2d 847, 858 (R.I.2001) (quoting *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I.1995)), we cannot say that the trial justice erred in her calculation of damages on this issue.

For the foregoing reasons, we deny BMPA's appeal from the judgments in favor of Sea Fare on the missing inventory and water use overcharges. We sustain, in part, BMPA's appeal from the hearing justice's grant of summary judgment in favor of Sea Fare pertaining to the rental provisions contained in the lease because material issues of fact exist concerning the interpretation of what portion, if not all, of BMPA's property was intended by the parties to be included in the lease for purposes of calculating the additional rent. Because such material issues of fact exist, and consistent with this opinion, we remand the papers in this case to the Superior Court for trial only on the additional rent issue.

---

**3.** The lease provides that "[t]he Lessee shall have the right at its own expense to install meters for determining the actual amount of its sewer and water useage [*sic*]."