June 12, 2019

Management Capital, L.L.C.          :

v.                    :

F.A.F., Inc. et al.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Management Capital, L.L.C.   :

v.      :

F.A.F., Inc. et al.    :

Present: Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** This case arises from the milieu of the financial world where arcane terms such as "stock warrant," "put," and "call" are commonplace but nevertheless remain alien to the uninitiated. The resolution of this appeal, however, requires us to resort to concepts distilled from principles taught in a first-year contracts class: reformation, ambiguity, and anticipatory repudiation. The plaintiff, Management Capital, L.L.C. (Management), initiated this litigation after the defendant, F.A.F., Inc. (FAF), maintained that a common stock warrant held by Management had no value. A Superior Court justice, sitting without a jury at a trial held over six days in June 2015, found in favor of Management. On appeal, FAF contends that the trial justice erred when he: (1) reformed certain dates in a stock warrant that he found were a result of mutual mistake; (2) determined that "funded debt" was an unambiguous term meaning "long-term debt"; (3) found that FAF repudiated its obligations under the stock warrant; (4) found that Management properly preserved its post-repudiation rights; (5) determined that Management proved its damages with reasonable certainty; (6) determined that prejudgment interest would accrue from October 13, 2008 onward; and (7) did not rule on FAF's counterclaims. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

In early 2002, Ernest Humphreys (Humphreys), Robert Manchester (Manchester), Steve Carlotti (Carlotti), and Jerry Cerce (Cerce) formed Management Capital, L.L.C. and Management Solutions, L.L.C. Drawing on the deep business and legal experience of their founding principals, Management Capital, L.L.C. invested in companies—often small, privately-owned business entities that had the potential to grow. Providing consulting and advisory services to these companies, Management Solutions, L.L.C. worked in concert with Management Capital, L.L.C.[1]

FAF, a Rhode Island jewelry company, was just the kind of company in which Management sought to invest; in other words, "an ideal client" for Management. Humphreys thought FAF was an "exciting company" with "tremendous opportunity," but, as of 2002, FAF faced an $11.5 million judgment (the BHG judgment) and a $1 million claim for damages (the Drianna claim) (collectively the claims). Manchester testified that, in light of the claims, FAF's value at that time was "not zero, but * * * nominal."

Cerce introduced Humphreys to his cousin, Arthur Fiorenzano (Fiorenzano), president of FAF, in early 2002. In the spring of 2002, Management and FAF agreed that Management would help FAF resolve the claims. The principals at Management were "excited" about "help[ing] [FAF] become more successful in the future." In addition to charging a $300 hourly fee, Management would receive a yet-to-be-determined "success fee" pending the results of Management's work.

---

[1] Management Solutions, L.L.C. assigned its right to the warrant at issue to Management Capital, L.L.C. We refer to both entities as "Management" for simplicity's sake. Additionally, shortly after Management formed, Carlotti left to concentrate on his private law practice. Cerce passed away in 2013.

In the summer of 2002, Management suggested to FAF that it grant a common stock warrant[2] (the Warrant) to Management upon its successful settlement of the BHG judgment. The Warrant would essentially serve as Management's "success fee." Armand Almeida (Almeida), FAF's chief financial officer (CFO), initially advised Fiorenzano against issuing a warrant to Management. Despite Almeida's qualms, FAF ultimately agreed to issue Management a warrant.

On July 26, 2002, Humphreys sent an email to Fiorenzano with a one-page summary of the "Warrant Terms" (the Warrant Terms) attached for the parties to discuss at an upcoming meeting. The Warrant Terms outlined the basic provisions of what would eventually become the Warrant. After some negotiation, the Warrant Terms were agreed to by both parties in writing on October 9, 2002.

According to the Warrant Terms, Management had the right to acquire 10 percent of FAF's stock for the exercise price of $710,000, exercisable any time before December 31, 2007. The $710,000 exercise price was based on 10 percent of FAF's then-current agreed value of $7.1 million. The Warrant Terms stated that the $7.1 million figure "values FAF at a 4 multiple of the average of the EBITDA for 2001 and forecast 2002, less only funded debt of approximately $3.7 million."[3]

---

[2] A stock warrant is "[a]n instrument granting the holder a long-term (usu. a five- to ten-year) option to buy shares at a fixed price." Black's Law Dictionary 1820 (10th ed. 2014).

[3] "EBITDA" is an abbreviation for "earnings before interest, taxes, and depreciation" and is defined as "[a] company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." Black's Law Dictionary 621 (10th ed. 2014).

Under the Warrant Terms, Management also had the right to put[4] the Warrant to redeem either the shares it had purchased from FAF or the Warrant itself; likewise, FAF had the right to call[5] the Warrant to force Management to sell whatever shares Management had purchased from FAF or the Warrant itself. Both the put and call rights were exercisable any time after December 31, 2007.

In December 2002, Management successfully resolved the claims against FAF. The next month, Management turned its focus to drafting the Warrant. On January 14, 2003, Humphreys sent an email to Almeida (David Syner, FAF's accountant (Syner), Fiorenzano, and Cerce were also copied), with a draft of the Warrant attached. During the following months, FAF and Management exchanged several communications regarding various terms of the Warrant.

Humphreys and Manchester testified that, at that time, Management's main priority was to ensure that Management would be able to review FAF's 2007 audited financial statements before Management decided whether to exercise or put the Warrant; this review period was not a concept captured by the initial draft Warrant or Warrant Terms. FAF agreed to Management's request, and a forty-five-day review period was inserted into the draft.[6] The following day, FAF's attorney, who was also involved in negotiating the Warrant, added language proposing September 30, 2007 as a definite date for the Warrant's expiration, among other edits. In a later draft, FAF's attorney, after a conversation with Humphreys, also inserted a provision that created

---

[4] A "put" or "put option" is "[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." Black's Law Dictionary 1268 (10th ed. 2014).

[5] A "call" or "call option" is "[a]n option to buy something (esp. securities) at a fixed price even if the market rises; the right to require another to sell." Black's Law Dictionary 1268 (10th ed. 2014).

[6] Almeida testified that "normally financial statements, audited financial statements are not ready until sometime in very late March generally into April. And [Humphreys] was asking for some time with those statements to evaluate them. And I just said that simply made sense to me."

a thirty-day window (the Window), allowing Management to put and exercise the Warrant simultaneously, or put the Warrant before Management was required to exercise the purchase of shares.

The creation of the Window resulted in two inconsistencies regarding the years in the provided deadlines to exercise and put/call the Warrant. Section 3 of the draft Warrant provided that the deadline to exercise the Warrant was seventy-five days after receipt of the 2007 audited financial statements or October 31, 2007, *whichever was the earlier to occur*. Similarly, Section 13 provided that the date the put/call rights began to run started forty-five days after receipt of the 2007 audited financial statements or September 30, 2007, *whichever was the earlier to occur*. A literal reading of Sections 3 and 13 would always result in the respective dates of October 31, 2007 and September 30, 2007 as the earlier date to occur, because the audited financial statements for the year ending December 31, 2007 would never be available until sometime in calendar year 2008. Despite a clear contradiction, these dates remained in the final Warrant.

Management and FAF executed the final Warrant on July 7, 2003. Under the terms of the final Warrant, Management had the right to acquire 10 percent of FAF's stock for the exercise price of $710,000, exercisable any time before either seventy-five days elapsed after Management received FAF's 2007 audited financial statements or October 31, 2007, whichever was the earlier to occur. The final version of Section 3.1 provided:

> "This Warrant may be exercised in whole or in part at any time by the registered holder by the surrender of this Warrant at any time after the date hereof and before 5:00 p.m. on: (a) the date which is seventy-five (75) days after receipt by [Management], or any subsequent holder hereof, of the audited financial statements of [FAF] for the year ending December 31, 2007; or (b) October 31, 2007, whichever is the earlier to occur ('Expiration Time'); together with payment to [FAF] of the Exercise Price (or portion thereof) for the shares to be purchased hereunder."

Section 13 provided a timeline for the put and call rights. Similar to Section 3, the right to put/call was exercisable any time before either forty-five days elapsed after Management received FAF's 2007 audited financial statements or September 30, 2007, whichever was the earlier to occur. The final version of Section 13 stated, in relevant part:

> "At any time after 5:00 p.m. on (a) the date which is forty-five (45) days after receipt by [Management], or any subsequent holder hereof, of the audited financial statements of [FAF] for the year ending December 31, 2007; or (b) September 30, 2007, whichever is the earlier to occur, [FAF] shall have a call and [Management] or any subsequent holder hereof shall have a put with respect to the Warrant, or the shares issued pursuant to this Warrant, if applicable. * * * The purchase price for the Warrant, or the shares issued pursuant to the Warrant, if applicable, shall be determined and paid as provided in <u>Section 14</u> hereof."

Section 14 set out a formula for calculating the purchase price. Section 14 provided, in relevant part:

> "The purchase price for the Warrant, or the shares issued pursuant to this Warrant, if applicable, shall be equal to the percentage ownership of [FAF] represented by the shares, multiplied by the Value of [FAF]. The Value of [FAF] shall be equal to: (a) the average EBITDA of [FAF] for the last 2 fiscal years of [FAF] prior to the exercise of the put or call; (b) multiplied by 5; (c) less only funded debt, all as of the last day of the most recently completed fiscal year of [FAF]. EBITDA shall be calculated using the audited financial statements of [FAF]."

Although the final Warrant encapsulated the basic ideas from the Warrant Terms, the final Warrant diverged from the Warrant Terms in a few significant respects. As mentioned above, the final Warrant included language providing Management with time to review FAF's 2007 audited financial statements, with a final expiration date. It also included the Window which allowed Management to simultaneously "exercise" and "put" the Warrant, netting out the difference. Moreover, Section 14 of the Warrant provided a formula to value FAF, should

Management have decided to put or FAF decided to call the Warrant. Unlike the Warrant Terms, this formula did not provide an estimated amount of "funded debt."[7]

A few years passed without any action on the Warrant. In late summer 2007, Management started to think about how it might want to proceed under the Warrant. Although FAF and Management had ceased working together sometime in 2005, Management continued to have an "excellent" relationship with FAF, according to Humphreys. Humphreys testified that, in light of this congenial relationship, Management's principals wanted to meet with Fiorenzano to express that, while Management still intended to exercise its rights under the Warrant, it wanted to "figure out what work[ed] best" for FAF.

Humphreys met with Fiorenzano in August 2007 to discuss how Management was to proceed under the Warrant. At that meeting, Fiorenzano informed Humphreys that FAF's new CFO, Lou Rotella (Rotella), would handle any Warrant-related issues. Manchester subsequently met with Rotella in September 2007. According to Manchester, Rotella had deemed the Warrant "valueless" based on his calculation using the years 2005 and 2006. Manchester testified that he explained to Rotella that the Warrant was intended to be based on 2006 and 2007, but that Rotella "agreed to disagree" with Manchester's understanding. Humphreys testified that Manchester was "shocked" when he returned from his meeting with Rotella. It was after this conversation that Management realized that the Warrant's dates were fundamentally inconsistent with each other.

Once Management realized the mistakes, Manchester sent a letter to Fiorenzano and FAF on September 28, 2007, asking FAF to amend the errors and asserting that, in Section 3.1, "the

---

[7] The original Warrant Terms stated: "The exercise price of the warrant shall be 10% of the current agreed value of FAF of $7.1 million. This values FAF at a 4 multiple of the average of the EBITDA for 2001 and forecast 2002, less only funded debt of approximately $3.7 million."

date of October 31, 2007 should have been October 31, 2008" and, in Section 13, "the [date of] September 30, 2007 should have been September 30, 2008." The letter stated that if FAF was in agreement as to the errors, Management would prefer the Warrant be amended. The letter continued, however, to inform FAF that "[i]n order to preserve [Management's] rights under the terms of the Warrant as presently written," Management believed it "necessary" to exercise its put rights.

FAF, through its attorney, promptly replied to Management's letter on October 1, 2007. In the letter, he noted the discrepancy between the dates, but asserted that the December 31, 2007 date was incorrect—not the September 30, 2007 and October 31, 2007 dates. FAF's attorney wrote "[m]y file clearly indicates that the parties always intended that the expiration date for the exercise of the Warrant would always be prior to 12/31/[0]7." He attributed the error to the drafting of the thirty-day Window, which allowed Management to simultaneously put and exercise the Warrant.

Additional back-and-forth discussions ensued between Management and FAF, including Management's rejected proposal that FAF purchase the Warrant for $2 million based on FAF's value in 2006 and 2007, in exchange for its release of FAF's obligations. During the fall of 2007, FAF also informed Management that it considered "funded debt" to include its revolving debt and not simply its long-term debt. On December 31, 2007, Manchester sent an email to Rotella and Fiorenzano, which served as a notice to FAF that Management was exercising its rights under the Warrant but would withdraw the notice "provided that a mutually satisfactory valuation with regard to the put" was reached. Manchester had one last meeting with Rotella in early 2008; Rotella maintained FAF's position, and no agreement regarding the Warrant dates was reached.

On March 21, 2008, Management filed a complaint against FAF in Providence County Superior Court. Count I asserted reformation of the Warrant based on mutual mistake; Count II requested declaratory judgment that funded debt is long-term debt; and Count III alleged breach of the duty of good faith and fair dealing. Count IV alleged that Fiorenzano had breached his fiduciary duty by funneling funds from FAF to an offshore account, and requested that FAF's affiliates be included in FAF's valuation.[8] Count V requested injunctive relief to bar FAF from holding stockholder meetings regarding the Warrant without first providing notice to Management.

On June 11, 2014, FAF moved for summary judgment on Counts I, II, and V of Management's complaint. Following a hearing on FAF's motion, the trial justice allowed the parties to submit supplemental briefing on whether FAF had repudiated its obligations under the Warrant. The trial justice denied FAF's motion for summary judgment in a written decision on April 2, 2015. In that decision, the trial justice explained that he would allow Management to pursue a theory of repudiation. The trial justice did not rule on the repudiation matter, however, because he determined that the disputed dates were the threshold issue, and that those dates were necessarily factual.

Accordingly, Management filed an amended complaint on May 6, 2015, adding a count for repudiation. A jury-waived trial was held on June 2, 3, 5, 8, 9, and 10, 2015. Manchester, Humphreys, Almeida, and Syner testified for Management; FAF's attorney testified for FAF.

On January 17, 2017 the trial justice issued a written decision, determining that: (1) the Warrant would be reformed to correct the dates based on the parties' prior mutual understanding; (2) the term "funded debt" meant "long-term debt"; and (3) FAF repudiated its obligations under

---

[8] The trial justice granted partial summary judgment on August 12, 2010 dismissing Count IV.

the Warrant. Additionally, after finding that Management had proven its damages with reasonable certainty, the trial justice awarded $1,234,055 in damages to Management and applied prejudgment interest as of October 13, 2008. Final judgment entered on March 22, 2017.

On March 31, 2017, FAF moved for a new trial or to alter judgment under Rule 59 of the Superior Court Rules of Civil Procedure. After a hearing, the trial justice denied FAF's motion on May 16, 2017. FAF filed a timely notice of appeal on May 23, 2017.

## II

### Standard of Review

We apply a deferential standard of review when we review the findings of fact made by a trial justice sitting without a jury. *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016). This Court will not reverse that ruling "unless the trial justice misconceived or overlooked material evidence[,]" *id.* (quoting *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015)), or "unless the decision fails to do substantial justice between the parties." *McEntee v. Davis*, 861 A.2d 459, 462 (R.I. 2004) (quoting *Paradis v. Heritage Loan and Investment Co.*, 701 A.2d 812, 813 (R.I. 1997)).

"This Court applies a deferential standard of review to mixed questions of law and fact." *Nationwide Property & Casualty Insurance Co. v. D.F. Pepper Construction, Inc.*, 59 A.3d 106, 111 (R.I. 2013). "A trial justice's findings on questions of law, however, are reviewed *de novo*." *Bank of America, N.A. v. P.T.A. Realty, LLC*, 132 A.3d 689, 692 (R.I. 2016) (quoting *Haviland v. Simmons*, 45 A.3d 1246, 1256 (R.I. 2012)).

## III

## Discussion

## A

## Reformation

FAF argues that the trial justice made a number of clearly erroneous factual findings underpinning his ultimate finding of mutual mistake, a prerequisite for judicial reformation of an agreement. Based on the record before the trial justice, FAF asserts that it would be impossible for the trial justice to determine whether a mutual understanding between Almeida and Humphreys existed as of June 2, 2003. Further, FAF suggests that the testimony of Almeida, FAF's former CFO, is unreliable because he was inexperienced with stock warrants and relied too heavily on FAF's attorney's expertise.[9] FAF maintains that these underlying errors cannot amount to a finding of mutual mistake. Management responds that the trial justice correctly reformed the Warrant after he concluded that there was clear and convincing evidence of a mutual mistake.

As with other written agreements, a stock warrant may be equitably reformed. *See, e.g.*, *Merrimack Mutual Fire Insurance Co. v. Dufault*, 958 A.2d 620, 624 (R.I. 2008). Reformation is an equitable remedy that allows the court to alter a written agreement "to reflect the actual intent of the parties," usually "to correct fraud or mutual mistake in the writing[.]" Black's Law Dictionary 1471 (10th ed. 2014). Accordingly, "the court must first find a mutual mistake." *Merrimack*, 958 A.2d at 624 (quoting *Gorman v. Gorman*, 883 A.2d 732, 740 (R.I. 2005)). A

---

[9] Even if this argument were tenable, "it is well established that 'a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents.'" *Rivera v. Gagnon*, 847 A.2d 280, 285 (R.I. 2004) (quoting *Kottis v. Cerilli*, 612 A.2d 661, 668 (R.I. 1992)). We, therefore, decline to address this argument.

mutual mistake is a mistake in the agreement which is "common to both parties" and "fails in some material respect correctly to reflect their prior completed understanding." *Hopkins v. Equitable Life Assurance Society of United States*, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970). "A party seeking reformation of an agreement must prove a mutual mistake of a material term of the agreement by clear and convincing evidence." *Merrimack*, 958 A.2d at 624.

Here, Almeida testified that Management's request during the 2003 Warrant negotiations to evaluate the 2007 audited financial statements "simply made sense" to him. Humphreys testified that, during the Warrant negotiations, Management stressed the importance that it be able to review FAF's audited financial statements prior to making a decision under the Warrant. Contradictorily, FAF's attorney, testifying on behalf of FAF, stated that the mistakes he had inserted into the drafts were for the years corresponding to the audited financial statements—the statements should have been for the year ending December 31, 2006, not 2007. Notably, FAF's attorney testified that there was no evidence of this mistake in any drafts or other related written communications. When pressed, he stated that he did not have a conversation with anyone about these dates. In his decision, the trial justice found "that the evidence clearly and convincingly establishes that the parties intended that Management would be able to review the audited financial statements for the year ending December 31, 2007 prior to deciding whether to buy shares or put the Warrant." He further found that FAF's evidence "falls short of overcoming Management's clear and convincing evidence proving otherwise."

After a review of the record, we agree that the evidence clearly and convincingly serves as grounds for reformation. The consistent and credible testimony of Humphreys and Almeida led the trial justice to conclude that there is a "variance between what is written and what was originally intended[.]" *Hopkins*, 107 R.I. at 685, 270 A.2d at 918; *see also Rivera v. Gagnon*, 847

A.2d 280, 284 (R.I. 2004) ("An agreement containing a mutual mistake fails in a material respect correctly to reflect the understanding of both parties."). At trial, Management demonstrated that, during the Warrant negotiations in 2002 and 2003, Management and FAF were laboring under the understanding that Management would be able to review the 2007 audited financial statements before Management decided how to act under the Warrant. The Warrant's dates as written, which are material in every respect, did not reflect that understanding. *See Rivera*, 847 A.2d at 284. Reformation, therefore, was appropriate.

We conclude that the mutual mistake has been proven by clear and convincing evidence, and that the trial justice did not err when he found the mistakes in the Warrant created a "classic case" for reformation.

**B**

**Funded Debt**

FAF also argues that the trial justice erred as a matter of law when he concluded that the term "funded debt" means long-term debt.[10] FAF advances three arguments as to why the trial justice erred. First, FAF argues that the trial justice, in his decision, mischaracterized FAF's position on "funded debt" as "all debt" rather than "all FAF bank debt." Next, FAF asserts that the trial justice erred when he ruled that the Warrant Terms were parol evidence and not fully integrated with the Warrant. Finally, FAF argues that the definition applied by the trial justice produces an unintended and unfair result. Management, on the other hand, contends that the plain and ordinary meaning of "funded debt" is "long-term debt."

Whether ambiguity exists in a contract is a question of law, which we review *de novo*. *Paul v. Paul*, 986 A.2d 989, 993 (R.I. 2010). A contract is ambiguous "only when it is

_____

[10] The term "funded debt" is found in Section 14 of the Warrant, see *supra* at page 6. It is used as part of a calculation to determine the purchase price to put or call the Warrant.

reasonably and clearly susceptible of more than one interpretation." *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I. 1996). If, on the other hand, a contract is "clear and unambiguous," its terms "will be given their usual and ordinary meaning and the parties will be bound by such meaning." *Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 238 (R.I. 2004) (quoting *Singer v. Singer*, 692 A.2d 691, 692 (R.I. 1997) (mem.)). "[T]he intent of the parties becomes irrelevant" when a contract is unambiguous. *Hilton v. Fraioli*, 763 A.2d 599, 602 (R.I. 2000) (quoting *Vincent Co. v. First National Supermarkets, Inc.*, 683 A.2d 361, 363 (R.I. 1996)). "We have long held that 'in situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids.'" *National Refrigeration, Inc. v. Standen Contracting Co.*, 942 A.2d 968, 972 (R.I. 2008) (brackets omitted) (quoting *Clark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 443 (R.I. 1994)).

"[I]n the absence of fraud or mistake, parol evidence of prior or contemporaneous agreements is generally inadmissible for the purpose of varying, altering or contradicting a written agreement." *Fram Corp. v. Davis*, 121 R.I. 583, 586-87, 401 A.2d 1269, 1272 (1979); *see also Inleasing Corp. v. Jessup*, 475 A.2d 989, 993 (R.I. 1984). "The basis of the rule is that a complete written agreement merges and integrates all the pertinent negotiations made prior to or at the time of execution of the contract." *Carlsten v. Oscar Gruss & Son, Inc.*, 853 A.2d 1191, 1195 (R.I. 2004) (quoting *Filippi v. Filippi*, 818 A.2d 608, 619 (R.I. 2003)). "A document is integrated when the parties adopt the writing as a final and complete expression of the agreement." *Id.* (quoting *Filippi*, 818 A.2d at 619). "Once integrated, other expressions, oral or written, that occurred prior to or concurrent with the integrated agreement are not viable terms of the agreement." *Id.* (quoting *Filippi*, 818 A.2d at 619).

Here, neither party argues that the term "funded debt," as used in the Warrant, is ambiguous. Accordingly, we will give the term "funded debt" its "usual and ordinary meaning[.]" *Andrukiewicz*, 860 A.2d at 238. Black's Law Dictionary defines "funded debt" as "[s]ecured *long-term* corporate debt meant to replace short-term, floating, or unsecured debt." Black's Law Dictionary 489 (10th ed. 2014) (emphasis added). As recognized by the trial justice below, the caselaw discussing the definition of "funded debt" is sparse throughout federal and state courts. One case, however, arrives at a similar understanding of funded debt after scrutinizing several dictionary definitions. *See Employees' Retirement System of Hawaii v. Ho*, 352 P.2d 861, 865 (Haw. 1960) (examining Palgrave's Dictionary of Political Economy, Webster's New International Dictionary, and Black's Law Dictionary); *see also Ketchum v. City of Buffalo*, 14 N.Y. 356, 379 (1856) (likening "funded debt" to a mortgage). Because "funded debt" is unambiguous, we therefore need not turn to extrinsic or parol evidence to give "funded debt" an alternative or contradictory meaning. *See Fram Corp.*, 121 R.I. at 586-87, 401 A.2d at 1272.

Despite acknowledging that "funded debt" is unambiguous, FAF nonetheless urges us to consider the Warrant Terms to discern the meaning of "funded debt," because FAF argues that the Warrant incorporates the Warrant Terms by reference. We have held that "instruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract." *Stanley-Bostitch, Inc. v. Regenerative Environmental Equipment Co., Inc.*, 786 A.2d 1063, 1065 (R.I. 2001) (quoting *Rotelli*, 686 A.2d at 94).

FAF maintains that the two documents are a complete and integrated contract because the Warrant Terms are incorporated by reference in the Warrant, through the Warrant's Exercise

Price.  Section 1.1 of the Warrant states, in part: "[Management] is entitled to purchase from [FAF], before the Expiration Time defined herein, the Warrant Shares (defined below) at an aggregate exercise price of Seven Hundred Ten Thousand ($710,000) Dollars ('Exercise Price')."  FAF traces the $710,000 Exercise Price in the Warrant to a formula used in the Warrant Terms to value FAF at $7.1 million, which, in turn is based on the approximately $3.7 million of funded debt.  This reference, FAF argues, integrates the Warrant Terms and the Warrant.

We fail, however, to see how the Warrant's recital of the Exercise Price by itself—without any mention of the formula used or other reference to the Warrant Terms—incorporates the Warrant Terms by reference. *See Stanley-Bostitch, Inc.*, 786 A.2d at 1065; *see also* 17A Am. Jur. 2d *Contracts* § 381 (2019) ("In order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated; it is not enough for the contract to merely mention the instrument, and the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument.").

We therefore conclude that the Warrant Terms are not integrated with the Warrant, and that the term "funded debt" unambiguously means "long-term debt."  *See* Black's Law Dictionary 489 (10th ed. 2014).

## C

### Anticipatory Repudiation

Next, FAF argues that the trial justice erred when he ruled that FAF repudiated its obligations under the Warrant.  In the alternative, FAF argues that, even if FAF repudiated its obligations under the Warrant, Management did not properly preserve its post-repudiation claim.  Management, on the other hand, asserts that the evidence supports the trial justice's

determination that FAF, through its combined statements and actions, positively and unconditionally repudiated its obligations under the Warrant, and Management properly preserved its post-repudiation rights by promptly filing a complaint against FAF.

**1**

**FAF Repudiated the Warrant**

FAF argues that, because FAF was acting under its interpretation of the Warrant, the trial justice erred as a matter of law by concluding that FAF's actions resulted in anticipatory repudiation. Management, however, argues that there is convincing evidence to support the trial justice's factual finding that FAF repudiated the Warrant.

Anticipatory repudiation "occurs when the promisor unequivocally disavows any intention to perform when the time for performance comes." Black's Law Dictionary 1496 (10th ed. 2014). In Rhode Island, "in order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional." *Thompson v. Thompson*, 495 A.2d 678, 682 (R.I. 1985) (quoting 11 Williston, *Contracts* § 1322 at 130 (3d ed. Jaeger 1968)). Further, "a repudiation can be evidenced by either a statement to that effect or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without [committing] a breach.'" *Id.* (quoting Restatement (Second) *Contracts* § 250(b) at 272 (1981)).

In *Griffin v. Zapata*, 570 A.2d 659 (R.I. 1990), we held that the actions and statements of a seller of property, together with the statements of his attorney, amounted to anticipatory repudiation of a purchase and sale agreement. *Griffin*, 570 A.2d at 662. The seller in *Griffin* communicated to the buyer that, because he had not yet secured alternate housing, he would not attend the closing. *Id.* The seller's attorney also informed the buyer that the closing would not

- 17 -

occur because the seller would not be attending. *Id.* Neither the seller nor the seller's attorney attended the closing, nor did they express any indication that the seller would be willing to close at a later date. *Id.* These actions and statements, this Court held, indicated "clear anticipatory repudiation" that the "seller did not intend to perform his part of the agreement" on the scheduled dates, "or within any reasonable time after[.]" *Id.*

In determining that FAF repudiated its obligations under the Warrant, the trial justice pointed to the October 1, 2007 letter from FAF's attorney to Management, which reiterated FAF's position that the Warrant's value was based on the 2006 financial documents. Coupled with Rotella's and Fiorenzano's statements to Management during the fall of 2007, the trial justice found that these "statements and actions" constituted "positive and unconditional" evidence of FAF's refusal to perform. *See Thompson*, 495 A.2d at 682 (quoting 11 Williston, *Contracts* § 1332 at 130). The trial justice found the testimony of Humphreys and Manchester credible that Rotella and Fiorenzano were steadfast in their insistence that the Warrant was valueless. The trial justice further analogized these facts to those in *Griffin*, finding the combined actions of Rotella and FAF's attorney similar to those of the seller and seller's attorney. *See Griffin*, 570 A.2d at 662. The trial justice reasoned that even if FAF's October 1, 2007 letter by itself did not amount to a clear repudiation of FAF's obligations under the Warrant, "when considered together with Rotella and Fiorenzano's statements, there is clear evidence" of FAF's refusal to perform.

On appeal, FAF points to a number of facts that FAF insists cannot amount to repudiation because Management never properly triggered FAF's obligations under the Warrant, therefore FAF could not possibly have repudiated. For example, FAF calls attention to Management's first attempt to put the Warrant on September 28, 2007, which, under either party's interpretation

- 18 -

of the dates, was too early.[11]  FAF argues that "[i]f [Management] truly intended to put the Warrant," it would have done so under at least one interpretation of the Warrant.  Moreover, FAF argues that Management's December 31, 2007 attempt to exercise was not properly executed because Management's attempt did not include a tender of $710,000, the Exercise Price, or a surrender of the Warrant.  FAF further asserts that its communications during this period did not constitute a positive and unconditional refusal to perform its obligations under the Warrant, rather it was merely communicating its good faith interpretation of the Warrant.

Here, after reviewing the record and applying deference to the trial justice's factual findings, *Nationwide Property & Casualty Insurance Co.*, 59 A.3d at 111, it is our opinion that there is ample evidence to support the trial justice's conclusion that FAF repudiated its obligations under the Warrant.  We are satisfied that FAF's actions sufficiently meet the "positive and unconditional" standard laid out in *Griffin*. *Griffin*, 570 A.2d at 662 (quoting *Thompson*, 495 A.2d at 682).  Rotella's and Fiorenzano's statements, together with FAF's October 1, 2007 letter from its attorney, conveyed to Management that FAF had no intention to perform its obligations under the Warrant.  Accordingly, we discern no error in the trial justice's finding of repudiation.

## 2

### Management Properly Preserved its Post-Repudiation Rights

FAF also argues that, even if it had repudiated the Warrant, Management failed to properly preserve its post-repudiation rights because Management's September 28, 2007 letter and December 31, 2007 email showed that Management elected to treat the Warrant as valid.

---

[11] Under FAF's interpretation of the dates, the September 28, 2007 put was two days before Management's rights to put vested, which would begin on September 30, 2007. Under Management's interpretation of the dates, the September 28, 2007 put was two days and a year before Management's rights to put vested, which would begin on September 30, 2008.

Management, on the other hand, argues that it was not treating the Warrant as valid when it sent those communications and that, by promptly filing suit on March 21, 2008, Management preserved its post-repudiation rights.

Generally, once a party has repudiated an agreement, the nonbreaching party may maintain a claim for breach, even though the time for performance has yet to come. 23 Williston, *Contracts* § 63:33 at 606-09 (4th ed. 2014). To do so, the nonrepudiating party usually has three options: (1) "rescind the contract altogether, and if any performance has already been rendered by the injured party, to recover its value * * * "; (2) "elect to treat the repudiation as a breach either by bringing suit promptly, or by making some change of position"; or (3) "await the time for performance of the contract and bring suit after that time has arrived." *Id.* at § 63:33 at 607-08. "A wrongful repudiation of a contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach." *Id.* at § 63:44 at 656.

Under the doctrine of election of remedies, "the pursuit of one remedy will exclude the pursuit of the other[.]" *Coderre v. Zoning Board of Review of City of Pawtucket*, 105 R.I. 266, 274, 251 A.2d 397, 402 (1969). The doctrine applies "only in those cases in which the party has two or more remedies which are inconsistent with each other." *Id.* "The test of inconsistency is whether the two modes of redress are such that the assertion of one remedy of necessity negates or repudiates the other." *Id.* "The essence of the doctrine of election of remedies is the conscious choice, with full knowledge of the facts, of one of two or more inconsistent remedies." *Rhode Island Hospital Trust Co. v. The Rhode Island Covering Co. Inc.*, 95 R.I. 30, 35, 182 A.2d 438, 441 (1962) (quoting *Adams v. Camden Safe Deposit & Trust Co.*, 2 A.2d 361, 394 (N.J. 1938)).

The trial justice found that Management appropriately preserved its post-repudiation rights when it "treated [FAF's] repudiation as a breach" and promptly filed a complaint against

FAF on March 21, 2008. Finding Management's actions "properly prompt," the trial justice explained that "[a]t its longest, this time period extends from October 1, 2007 to March 21, 2008, a period that the [c]ourt considers sufficiently close in time to be prompt." The trial justice did not consider Management's actions via the September 28, 2007 and December 31, 2007 communications to be an election of remedies because he considered Management's actions "ineffective" under the reformed Warrant.

On appeal, FAF reiterates that, because Management attempted to put the Warrant on September 28, 2007, and attempted to exercise the Warrant on December 31, 2007, Management elected to treat the Warrant as valid, and, because Management elected that remedy, Management cannot now assert repudiation.

As stated above, we review questions of law *de novo*. *Bank of America, N.A.*, 132 A.3d at 692. Upon our review, however, we agree with the trial justice that Management properly preserved its post-repudiation rights by promptly filing suit after it realized FAF was not going to honor the Warrant. *See* 23 Williston, *Contracts* § 63:33 at 607. Like the trial justice, we consider Management's actions, from the discovery of the repudiation sometime in September or October 2007 to the filing of suit in March 2008 sufficiently prompt to preserve its repudiation rights. We do not regard Management's September 28, 2007 letter and December 31, 2007 email as prohibiting Management from filing suit under the doctrine of election of remedies. *See Coderre*, 105 R.I. at 274, 251 A.2d at 402. Under the reformed Warrant—which was reformed to reflect the parties' prior understanding that Management would be able to review FAF's 2007 audited financial statements before acting under the Warrant—any attempt to act under the Warrant in 2007 was futile because the 2007 audited financial statements were not yet available. Therefore, Management's September 28, 2007 letter and December 31, 2007 email are not inconsistent with

filing suit on March 21, 2008, *see id.*, because, under the reformed Warrant, an exercise of rights in 2007 was simply not an available remedy, much less a "conscious choice, with full knowledge of the facts[.]"[12] *Rhode Island Hospital Trust Co.*, 95 R.I. at 35, 182 A.2d at 441 (quoting *Adams*, 2 A.2d at 394).

FAF further argues that Management's original complaint filed on March 21, 2008 did not treat FAF's actions as repudiation because it did not include a count for breach of contract or anticipatory repudiation. The complaint, however, did include a count for breach of the duty of good faith and fair dealing, a count inherently linked with a claim for a breach of contract. This count alone would be sufficient to save Management's post-repudiation complaint. *See* 23 Williston, *Contracts* § 63:22 at 552 ("Violation of the duty of good faith and fair dealing constitutes a breach of contract."). Perhaps more significantly, however, the trial justice allowed Management to amend its complaint to include a count for anticipatory repudiation under Rule 15 of the Superior Court Rules of Civil Procedure.

Rule 15(a) provides that after a responsive pleading has been served, a party may amend the pleadings "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Rule 15(b) states: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." "We have consistently interpreted Rule 15(a) to allow trial justices to grant amendments to the pleadings liberally if justice so requires."

---

[12] FAF invites us to apply *Lucente v. International Business Machines Corp.*, 310 F.3d 243 (2d Cir. 2002), a United States Court of Appeals for the Second Circuit case which has no precedential value. Moreover, when we compare the facts in this case, they are readily distinguishable. In *Lucente*, the plaintiff waited almost six years after receiving a cancellation letter regarding his stock options to file for breach, and then, after filing, tried to exercise his remaining stock option. *Id.* at 248, 250, 251. Here, Management filed suit before the 2007 audited financial statements would have been available—there were no "wait-and-see" antics.

*Faerber v. Cavanagh*, 568 A.2d 326, 328-29 (R.I. 1990). We encourage allowance of amendments "in order to facilitate the resolution of disputes on their merits[,]" *Wachsberger v. Pepper*, 583 A.2d 77, 78 (R.I. 1990); however, we note that whether the party opposing the amendment would be prejudiced is "central" to a trial justice's decision to grant an amendment. *Harodite Industries, Inc. v. Warren Electric Corp.*, 24 A.3d 514, 531 (R.I. 2011) (quoting *Faerber*, 568 A.2d at 329).

Management's amended complaint, although filed weeks before trial, was allowed after the trial justice directed both parties to file supplemental memoranda, and after a hearing on the issue. *Cf. Connecticut Valley Homes of East Lyme, Inc. v. Bardsley*, 867 A.2d 788, 793 (R.I. 2005) (holding that the defendant was not entitled to amend his answer to include a counterclaim one hour before bench trial in plaintiff's action for breach of contract because such amendment would be prejudicial to plaintiff, who did not have an opportunity to prepare a defense to such counterclaim). In his ruling on the amended complaint, the trial justice surmised whether an amendment to add a count for breach and/or repudiation was necessary in light of Management's encompassing count for breach of good faith and fair dealing, but nonetheless elected to treat Management's complaint as amended "[i]n order to set aside any doubt on this issue[.]"

We see no prejudice as a result of the amendment's allowance. Any technical argument FAF brings forth regarding Management's original pleadings is cured by the proper allowance of the amended complaint. We conclude that Management properly preserved its post-repudiation rights.

## D

## Damages

FAF argues that the trial justice erred when he determined that Management had calculated damages in the amount of $1,234,055 with reasonable certainty.[13]  This argument is largely premised on FAF's argument regarding the definition of "funded debt" because that term is used in Section 14 of the Warrant, which Management used to calculate its damages.

"It is well settled that a court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract." *Sophie F. Bronowiski Mulligan Irrevocable Trust v. Bridges*, 44 A.3d 116, 120 (R.I. 2012) (brackets omitted) (quoting *Riley v. St. Germain*, 723 A.2d 1120, 1122 (R.I. 1999)).  "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty * * *." *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 273 (R.I. 2002) (quoting *Sea Fare's American Café, Inc. v. Brick Market Place Associates*, 787 A.2d 472, 478 (R.I. 2001)).  A party "will not be denied recovery merely because the damages are difficult to ascertain" but the party must "prove damages with reasonable certainty." *Bridges*, 44 A.3d at 120 (deletion omitted) (quoting *Sea Fare's American Café, Inc.*, 787 A.2d at 478).  "The existence of damages, including their certainty, is a question for the factfinder to decide." *Fogarty v. Palumbo*, 163 A.3d 526, 537 (R.I. 2017).

---

[13] FAF also argues that an underlying figure in Management's damages calculation was not properly proven with reasonable certainty because the record does not support a possible calculation of this number.  To the extent FAF argues that the underlying figure used was not in evidence, FAF did not object to Manchester's testimony for lack of foundation nor did it move to strike.  We, therefore, consider this argument waived. *See State ex. rel. Town of Tiverton v. Pelletier*, 174 A.3d 713, 718 (R.I. 2017) ("[A]n issue that has not been raised and articulated previously at [the] trial [court] is not properly preserved for appellate review.") (quoting *In re Shy C.*, 126 A.3d 433, 435 (R.I. 2015)).

During trial, Manchester walked through an explanation of his damages calculation. Management's damages are based upon the calculation provided by Section 14 of the Warrant and the underlying figures were provided in an exhibit admitted in full. The damage calculation was also based on a figure of "long-term debt" as the "funded debt" referenced in Section 14. FAF provided no alternative calculations on appeal or at trial.

The trial justice found Manchester's testimony credible, and combined with the calculations included in the exhibit, found that Management had satisfied its burden of proving damages with reasonable certainty. The trial justice's determination is entitled to great weight, *see Fogarty*, 163 A.3d at 537, and FAF has not provided us with any reason to disturb it.

**E**

**Prejudgment Interest**

FAF also argues that the trial justice erred when he determined that Management was entitled to prejudgment interest beginning on October 13, 2008. FAF argues that this date is a purely hypothetical date that Management could have exercised under the Warrant.

The Rhode Island prejudgment interest statute, G.L. 1956 § 9-21-10(a), provides:

> "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein."

Prejudgment interest "is not an element of damages but is purely statutory, peremptorily added to the award by the clerk." *Metropolitan Property and Casualty Insurance Co. v. Barry*, 892 A.2d 915, 919 (R.I. 2006) (quoting *Barbato v. Paul Revere Life Insurance Co.*, 794 A.2d 470, 472 (R.I. 2002)). It serves a dual purpose: "to encourage early settlement of claims and to compensate an injured plaintiff for delay in receiving compensation to which he or she may be

entitled." *Id.* Prejudgment interest is calculated "from the date the cause of action accrued," § 9-21-10(a), which this Court has explained is "the first date an injured party has a right to seek judicial relief." *Barry*, 892 A.2d at 924 n.5.

At trial, Management argued that statutory interest should be calculated from October 13, 2008. In his testimony, Manchester clarified why that date should be deemed "the date the cause of action accrued[.]" *See* § 9-21-10(a). He first explained that he chose April 1, 2008 as the time Management was likely to have received the 2007 audited financial statements. Reading Sections 3 and 13 together, Management would have seventy-five days to decide whether to buy shares or put the Warrant. Manchester testified that the last date for Management to decide how to act under the Warrant would have been June 15, 2008. Next, also pursuant to Section 13, there were 120 days to deliver the payment, of which the last possible date would have been October 13, 2008. The trial justice concurred with Manchester's calculation for purposes of establishing the date of accrual for the award of prejudgment interest.

We are of the opinion that the trial justice did not err when he determined that October 13, 2008 is the date when prejudgment interest should begin to run. Accordingly, we shall not disturb the award of prejudgment interest.[14]

---

[14] FAF also argues that the trial justice erred when he did not rule on FAF's counterclaims. The counterclaims FAF asserted include counts for fraud or misrepresentation by statement, negligent misrepresentation by statement, and fraud or misrepresentation based on omission. In his decision, the trial justice did not address FAF's counterclaims because he found for Management on Management's three major claims. Specifically, the trial justice noted in a footnote: "Because the [c]ourt finds in Management's favor on these three issues, there is no need to address [FAF's] counterclaims." After our review of the record, we find that the record is entirely devoid of any proof FAF put forward to support its counterclaims. We hold that the trial justice did not err as a matter of law when he did not rule on FAF's counterclaims; there simply was no need to.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice Robinson did not participate.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Management Capital, L.L.C. v. F.A.F., Inc. et al. |
| **Case Number** | No. 2017-275-Appeal.<br>(PB 08-2364) |
| **Date Opinion Filed** | June 12, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Michael A. Silverstein |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Joseph V. Cavanagh, Jr., Esq.<br>Robert James Cavanagh, Jr., Esq.<br><br>For Defendants:<br><br>Robert D. Wieck, Esq.<br>Rajaram Suryanarayan, Esq. |